Attachment: C

# Tab B:

# Jurisdictional

# Items

# Documents

1 of 5



*Attachment C*

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Jackson Area Office
100 West Capitol Street, Suite 338
Jackson, MS 39269
(769) 487-6910
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

### Issued On: 03/07/2024

**To:** Mrs. JOANN D. WALKER
503 East Jefferson Street
YAZOO CITY, MS 39194

**Charge No:** 423-2023-01219

EEOC Representative and email:    SHAMLA MOORE
FEDERAL INVESTIGATOR
SHAMLA.MOORE@EEOC.GOV

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 423-2023-01219.

On behalf of the Commission,

Eszean McDuffey    Digitally signed by Eszean McDuffey
Date: 2024.03.07 16:33:56 -06'00'

Eszean McDuffey
Area Office Director

Cc:
BRYAN ROBERTS
421 W PASCAGOULA ST
JACKSON, MS 39203
Bryan.roberts@mdoc.state.ms.us

KENDRA MICHAEL
421 W PASCAGOULA ST
JACKSON, MS 39203
Kmmichael@mdoc.state.ms.us

*2 of 5*

Please retain this notice for your records.



Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you** *receive* **this Notice.** Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice.** Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file,** submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 423-2023-01219 to the District Director at U.S. EEOC, 1130 22nd Street South, Suite 2000, Birmingham, AL 35205.

**To make a Section 83 request for your charge file,** submit a signed written request stating it is a "Section 83 Request" for Charge Number 423-2023-01219 to the District Director at U.S EEOC, 1130 22nd Street South, Suite 2000, Birmingham, AL 35205.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

3 of 5

Enclosure with EEOC Notice of Closure and Rights (01/22)

## NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at:
http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), "major life activities" now include the operation of major bodily functions, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one major life activity need be substantially limited.**

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of "mitigating measures" (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it would be **substantially limiting when active.**

- ✓ An impairment may be **substantially limiting even though it lasts or is expected to last fewer than six months.**

### "Regarded as" coverage

An individual can meet the definition of disability if an employment action was taken because of an actual or perceived impairment (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively both transitory (lasting or expected to last six months or less) and minor.

- ✓ A person is not able to bring a failure to accommodate claim if the individual is covered only under the "regarded as" definition of "disability".

4 of 5

Enclosure with EEOC Notice of Closure and Rights (01/22)

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at <ins>http://www.eeoc.gov/laws/types/disability_regulations.cfm</ins>.*

5 of 5

Date: 31st May 2024

To: District Director at U.S. EEOC
1130 22nd Street South, Suite 2000
Birmingham, Al 35205

From: Joann Walker, Charging Party
503 E. Jefferson St.
Yazoo City, MS 39194

RE: Section 83 Request for Charge No. 423-2023-01219

I, Joann Walker is making a "Section 83 request" for my charge file # 423-2023-01219 to the District Director at U.S. EEOC.   Attached are outlined information concerning my case that was filed through EEOC and a copy of my Right To Sue letter is enclosed.

Respectfully Yours,

Joann Walker,                    4/11/24
Joann Walker,                    Date

Ms. Joann Walker
503 E. Jefferson St.
Yazoo City, MS 39194
(662)571-9124
JoWalker@mdoc.state.ms.us (work)
delenewashington@gmail.com (personal)

### Cover Sheet

Date: 24th May 2024

To: Freedom of Information Act (FOIA)
    District Director at U.S. EEOC

From: Joann Walker, Charging Party
      Charge No. 423-2023-01219

Dear FOIA:

Please see the Information below:

I.    Completed Pro-SE-7 form (Complaint for Employment Disability)
II.    Who Am I Suing
III.    Cause of Action : Ex Parte-Young Case
IV.    Outlined Copies of Charging Party Case
    A: Joann Walker Charge of Discrimination
    B: Joann Walker Pre-Determination Interview
    C: Determination & Notice of Rights (Right to Sue Letter)
    D: Charging Party Documents (Inquiry Information)
    E: FU Interview Notes
    F: Position Statement from MDOC (Attorney Roberts)

Page-2-
FOIA Request
Charge No. 423-2023-01219

    G:  Respondent Answer to Position Statement
    H:  State application for the Program Specialist II Position
              1.  Joann Walker
              2.  Priscilla Johnson
              3.  Jawan Bowie
    H:  Substitution of Work Experience Letter for the
        Program Specialist II Position and Approval letter for
        The position
              1.  Joann Walker
    H:  Interview Letter sent to
              1.  Joann Walker
              2.  Priscilla Johnson
              3.  Jawan Bowie
    I:  Interview Questions, Answers, & Scoring Sheets on
              1.  Joann Walker
              2.  Priscilla Johnson
              3.  Juwan Bowie
    J:  Interview Panel List & Comments from Supervisor
    K:  Request for Information not Received: **Priscilla Johnson**
              Copy of the substitution approval letter for employee,
              (Showing that she was qualified to apply for this
              position (Program Specialist II)
    L:  Letter from Birmingham District Office: Alicia Vickers
    M:  Copies of ID (3), Educational History (3), and Hiring Information
        Of  Applicants (2)
        1.  Joann Walker
        2.  Priscilla Johnson
        3.  Jawan Bowie
    N:  Emails received from Supervisor, Shelly McTeer

**Ms. Joann Walker**
503 E. Jefferson St. Yazoo City, MS 39194
(662) 571-9124
JoWalker@mdoc.state.ms.us (work)
delenewashington@gmail.com (personal)

October 21, 2023

Bryan P. Roberts, Attorney
MS Department of Corrections
301 North Lamar Street
Jackson, MS 39201

RE:    **Charging Party Joann Walker**
       **Charge No.: 423-2023-01219**

Dear Mr. Roberts:

I, Joann Walker am submitting this correspondence as my official response to the position statement concerning the issues related to charge number: 423-2023-01219. Additionally, I have attached documentation that is relevant to this charge for your consideration as well.

Below is a chronological accounting of my career with the Department of Corrections (MDOC).

Initially, I began my career with MDOC in September 1995 when I was hired by MDOC to work at the Madison County Community Work Center (CWC) as a Correctional Service Aide I. In 2006, I was promoted to the position of Correctional Case Manager. I resigned from my employment with MDOC in 2007 and was rehired back with MDOC in November 2009 as a Correctional Service Aide II at the Hinds County Restitution Center in Jackson, Mississippi. Later was I was promoted to the position of Correctional Case Manager at the Yazoo County Community Work Center (CWC), and I worked this position until this CWC location was closed in 2016. After the closure of the Yazoo CWC, I was transferred to the Leflore County Restitution Center in Greenwood, Mississippi and in November 2016 I was transferred to Hinds County Probation and Parole Office as a Special Projects Officer II. In 2020, my position title was changed from Special Projects Officer II to Parole Specialist II.

On January 10, 2023, I applied for the Position of Program Specialist II that was listed through the State Personnel Board for the Hinds and Madison Counties locations at the Probation and Parole Offices.   On January 23, 2023, I received an email from Mrs. Shelby McTeer stating that my name was on the list of eligible for the position and if I was interested in interviewing to respond to the email no later than January 25, 2023. I replied and made the contact and scheduled my interview for January 26, 2023, at 10:00 a.m.   At the conclusion of the

Pro-Se-7                    Letter: E
                            1 of 5

Page -2-
Response to Charging Party: Joann Walker
Charge No.: 423-2023-01219

interview, I asked the question, when will the position(s) be filled; Ms. McTeer responded that we (she, PPAS Gibbons and LEO II Mr. Holman) will make a decision today or within the next week.

On October 3, 2023, I received the Position Statement from MDOC Attorney and other paperwork which stated that Priscilla Johnson signed the MDOC applicant Date Form and Section 47-5-47 Mississippi Code of 1972 on January 27, 2023, one day after the interview. Also, on February 1, 2023, PTR for Priscilla Johnson was submitted for signature by CCD Hairston and forwarded to Human Resources. On February 28, 2023, I emailed Mrs. McTeer inquiring about the status of the positions and she replied to me (via email) stating that all paperwork has been sent in and the Personnel Department would notify me when the position was filled (which at that time she already knew the position was filled); see attachment A.

On March 3, 2023, Mrs. McTeer was notified by Rotanya Kendrick via mail that per the State Personnel Board (SPB), Priscilla Johnson lack the required Bachelor's Degree and that she may request a substitution of 2 Associate Degrees as a substitution for the Bachelor's Degree. Mrs. McTeer stated that she would have to select the next highest scoring candidate or ask Ms. Johnson to send a substitution letter to SPB. Per documentation, it states in the Position Statement that Mrs. Johnson stated she had already submitted a substitution letter. I, Mrs. Walker, did not receive a copy of the substitution letter nor verification of the date in which the Substitution letter was submitted to the SPB, indicating whether it was before or after Mrs. Johnson interviewed for the position. Furthermore, it was stated that copies of all emails would be provided for review; to date Mrs. Walker has not received copies of the emails.

On June 8, 2023, I emailed Ms. McTeer again in reference to the status of the Program Specialist II position (although Ms. Johnson was already hired and working in the position, even though Ms. Johnson did not state what her position title was). The next evening (June 9, 2023) around 5:35 p.m., Ms. McTeer responded with a letter stating that she apologizes for the late notification, but the position was filled (see attachment C).

After reviewing the applicant's application, (see attachment C) interview questions and answers (see attachment D), and Score Sheet (see Attachment E) in particular points for experience, Priscilla Johnson stated on her application that she only has two (2) years of experience (which rates 6 points), but on her applicant scoring sheet it is shown that she has minimum and more than 5 years of experience (which rated her at 10 points). Also, in the written exercise, the potential points – 15 points for content, Ms. Johnson was given 14 points; and for spelling and grammar with a potential points of 15, Ms. Johnson was given 14 points, even after having at least six (6) or more misspelled words and several noted grammar errors (see attachment D).

Letter E.
2 of 5

Pro-Se-7

Page -3-
Response to Charging Party: Joann Walker
Charge No.: 423-2023-01219

Additionally, there were discrepancies in other interview questions. Please see attachment D: Interview Questions for Region II Position of Program Specialist II. Noted below are questions and answers as given by Ms. Johnson that were inadequate in response and points awarded.

> **Question #4:** If you are working alone . . . (Partial restatement of question, with only key phrase being stated).
> <u>Ms. Johnson's answer:</u> Ms. Johnson responded that she would "ask another agent to assist".
> <u>My answer:</u> See them (the visitor) up front and not let them come to the back (to my office). Mr. Bowie's answer: He stated that he comes to work to work and he doesn't mine working alone or with sex offenders.
> <u>My Comment:</u> How would or could you ask another agent to assist, if as the question asked, "you are working alone"? The points awarded to both of us (me and Ms. Johnson) was 4 points. Ms. Bowie was awarded 5 points.

> **Question #6:** My concern is that points were awarded unfairly and incorrectly.
> Ms. Johnson and I responded to the question with the same answer, however, Ms. Johnson was awarded 5 points, and I (Mrs. Walker) was awarded 4 points. Mr. Bowie's answer was also the same as mine and he was awarded 5 points.
> <u>My Comment:</u> Why were not points awarded correctly for the answers given based on the questions asked?

> **Question #7:** My concern is that points were awarded unfairly and incorrectly.
> Ms. Johnson was awarded 5 points, when in fact she did not answer the question correctly. Mr. Bowie's answer and mine were the same, he was awarded 5 points and I was awarded 4 points.
> <u>My Comment:</u> Why were not points awarded correctly for the answers given based on the questions asked?

> **Question #8:** My concern is that points were awarded unfairly and incorrectly.
> Ms. Johnson and I (Mrs. Walker) both answered the question the same way; Ms. Johnson was awarded 5 points, and I (Mrs. Walker) was awarded 4 points.
> <u>My Comment:</u> Why were not points awarded correctly for the answers given based on the questions asked?

> **Question #9:** My concern is that points were awarded unfairly and incorrectly.
> Ms. Johnson responded but her response was not an answer to the question asked and yet she was awarded 4 points; I (Mrs. Walker) answered the question and was awarded 3 points. Additionally, to this same question, Mr. Bowie did not answer the question correctly and he was awarded 4 points.
> <u>My Comment:</u> Why were not points awarded correctly for the answers given based on the questions asked?

Pro-Se -7
Letter E
3 of 5

Page -4-
Response to Charging Party: Joann Walker
Charge No.: 423-2023-01219

> **Question #10:** My concern is the points were awarded unfairly and incorrectly. Ms. Johnson and Mr. Bowie were both awarded 4 points each, when in fact they did not answer the question in order. I (Mrs. Walker) answered the question and was awarded 3 points.
> <u>My Comment:</u> Why were not points awarded correctly for the answers given based on the questions asked?

## <u>ADDITIONAL COMMENTS</u>

Per conversation from with other employees at Hinds Probation and Parole Office, Ms. Johnson told them that she was home lying across her bed, when she received a phone call from Ms. McTeer, in which she was asked if she wanted the position of Program Specialist II, since the pay was higher than the previous position she had. And to this question from Ms. McTeer, Ms. Johnson stated she answered "yes" she wanted the job. Thus, it is my thinking that this is why Ms. Johnson's points were awarded in a manner that totaled higher than mine and all the other candidates except Mr. Bowie who was the same.

Moreover, even though Ms. Johnson's answers did not match the questions asked and her experience was not more than my experience, Ms. McTeer found it necessary to award her more points in order to show on paper that she ranked the highest of all candidates which would justify why she (Ms. Johnson) was given the position. It appears that Ms. McTeer had predetermined that Ms. Johnson would be the selected candidate regardless of the true scoring (her answers matching the questions with the correct awarded points). I (Mrs. Walker) also believe that there was no thought that anyone would question (file suit or a claim of unfairness) about the position being given to a less qualified candidate.

Although, I do not have an associate or bachelor's degree, my work experience of 20 years working with the Mississippi Department of Corrections in various correctional facilities more than qualifies me for the position of Program Specialist II. I have experience in supervising up to 180 offenders and residents, going to court, assisting with and completing Correctional Service Aide I duties, inclusive of answering the phone and answering inquirers questions on the procedure and protocols that must be followed by the offenders, setting up offender files (initial intake, risk assessment, post sentence investigation, and taking offenders pictures for loading them in the Caseload Explorer system and other related duties as assigned). In comparison, Ms. Johnson has only one (1) year and seven (7) months of work experience as a Correctional Service Aide II with Mississippi Department of Corrections, which include duties of answering the phone sometimes (turned the ringer off during work hours), partially set-up offenders files (Initial intake, risk assessment, post sentence investigation and taking pictures).

Pro-Se-
Letter E
4 of 5

Page -5-
Response to Charging Party: Joann Walker
Charge No.: 423-2023-01219

And lastly, in comparison of resumes (see attachment F), Ms. Johnson versus my (Mrs. Walker) resume for positions held working with MDOC, Ms. Johnson's resume is not explicit in the description of her job duties for the position she held.  My resume is inclusive of the description of job duties and tasks performed for each position held.

In summary, it is my conclusive opinion and belief that the awarding of the position of Program Specialist II with MDOC was predetermined prior to the interview process and thus points were awarded during the interview to insure that the preselected candidate would be appear to be the best qualified candidate, when in fact she (Ms. Johnson) and he (Mr. Bowie) were not the best candidate for the position.

I am requesting that a thorough review of this application and candidate selection process be reviewed in in accordance with the hiring policies of the State Personnel Board and those of MDOC, to rectify the wrong that has transpired in hiring the less qualified candidate for the position of Program Specialist II.

Also, at the time Ms. Johnson was hired I was a 55 year old employee of this company and have been working as an employee of MDOC for over 13 years now.  I feel I have been an excellent employee during the entire period I have been working for MDOC.  I have always achieved the goals that have been set before me.  I have been punctual, reliable and efficient. Despite all this, you hired an employee that's only 28 years old, also half my age who had left the company only after working 1 years & 7 months as a Correctional Service I.

If additional information is required from me, do not hesitate to contact me immediately in writing.

Sincerely,

Mrs. Joann Walker

Pro-Se-
Letter E
5 of 5

II &
III

Ms. Joann Walker
503 E. Jefferson St.
Yazoo City, MS 39194
(662)571-9124
JoWalker@mdoc.state.ms.us (work)
delenewashington@gmail.com (personal)
Charge No. 423-2023-01219

II.  WHO AM I SUING:

I, Joann Walker, Charge No. 423-2023-01219 is suing Burl Cain, as Commissioner of MDOC, under Ex-Parte Young for prospective equitable relief on instatement into the position (Program Specialist II) and an injunction prohibiting further violations.

III.  Cause of Action:  See Ex Parte-Young Case attached

.

Pro-Se-7

Roman #:  V. Relief





Volume 60, Issue 4

Page 989

Stanford Law Review

# EX PARTE *YOUNG*

John Harrison

© 2008 by the Board of Trustees of the Leland Stanford Junior University, from the *Stanford Law Review* at 60 STAN. L. REV. 989 (2008). For information visit http://lawreview.stanford.edu.

# EX PARTE *YOUNG*

## John Harrison*

*Ex parte Young does not represent an exception to ordinary principles of sovereign immunity, it does not employ a legal fiction, it does not imply a novel cause of action under the Constitution or other federal law, and it does not create a paradox by treating officers as state actors for one purpose and private persons for another. The conventional wisdom is wrong with respect to all those issues for the same reason: Young was about a traditional tool of equity, the injunction to restrain proceedings at law, or anti-suit injunction. By seeking an anti-suit injunction, a potential defendant at law can become a plaintiff in equity and present a defense in an affirmative posture. Asserting defenses against the government, like the railroads' constitutional defenses at issue in Young, does not offend sovereign immunity, so it does not require a fiction to cover up a violation of sovereign immunity. Anti-suit injunctions have long been a standard tool of equity, and so in approving one the Court in Young did not recognize a novel cause of action applicable only to government officers, and for that reason did not encounter a paradox. This Article elaborates on the argument just described, discusses the extent to which the opinion in Ex parte Young reflects the fact that it involved an anti-suit injunction, and briefly considers the contemporary implications of this way of understanding this foundational case.*

INTRODUCTION..................................................................................990
I. *EX PARTE YOUNG* AND ITS FICTION ....................................991
   A. Ex Parte Young........................................................................991
   B. *The* Ex Parte Young *Legal Fiction*.......................................994
II. *YOUNG* AND SOVEREIGN IMMUNITY.....................................996
   A. *Anti-Suit Injunctions and Sovereign Immunity*....................996
   B. *Anti-Suit Injunctions, Negative Relief, and the Opinion in* Young............1002
III. *YOUNG* AS APPLIED DOCTRINE ..........................................1008
IV. THE *EX PARTE YOUNG* CAUSE OF ACTION ......................1011
   A. *Fiction, Paradox, and Anti-Suit Injunctions* ......................1011
   B. *The Cause of Action in the Court's Opinion* .......................1017
CONCLUSION....................................................................................1018

* D. Lurton Massee, Jr. Professor and Horace L. and Grace Doherty Charitable Foundation Research Professor, University of Virginia School of Law; on leave 2008 as Counselor on International Law to the Legal Adviser, United States Department of State. The views expressed in this Article are those of the author and not the United States Department of State. Thanks to participants in workshops at the University of Virginia and Stanford law schools.

INTRODUCTION

> Again; if the State is to be considered a party, it is a party plaintiff. The State
> is the actor, and the Bank is a defendant. In form it may not be so, but the
> substance is to be regarded.[1]

Each of us may hope that by our hundredth year much of our youth will
have been forgotten. That has happened with *Ex parte Young*,[2] a central case
with respect to sovereign immunity and constitutional remedies. Today the
Supreme Court maintains that *Young* used a legal fiction to create an exception
to principles of sovereign immunity. It is also commonly thought that the case
recognized a new cause of action founded in the Constitution, and that it entails
a paradox because it requires that an officer defendant like Attorney General
Young be treated as the State for purposes of liability but not as the State for
purposes of sovereign immunity.

There is no exception, no fiction, no new cause of action, and no paradox,
and all for the same reason. *Ex parte Young* approved the use against a state
officer of a standard tool of equity, an injunction to restrain proceedings at law.
Through an anti-suit injunction a party who would be the defendant in a
corresponding lawsuit can enforce in equity a legal position that would be a
defense at law. That is what the railroads who sued Attorney General Young
were seeking to do. Sovereign immunity permits private people to assert
defenses against the government, so a suit against an officer that enforces a
defense is consistent with sovereign immunity, not an exception to it, and
requires no fiction for its justification. Anti-suit injunctions have been a staple
of equity for centuries, so the injunction approved in *Young* did not rest on a
novel cause of action derived from the Fourteenth Amendment. Because
Attorney General Young's liability to an anti-suit injunction did not derive
from a rule applying only to the State, it was not necessary both to affirm and
deny that he acted for the government, and so there is no paradox.

*Ex parte Young* is important mainly with respect to sovereign immunity, so
most of this Article is about that aspect of the case. Part I discusses *Young* and
the litigation that gave rise to it, and the Court's current view that the case
employs a legal fiction to create an exception to sovereign immunity. Part II
provides a rationale for the case based on the nature of anti-suit injunctions,
which enable potential defendants at law to present their defenses in equity.
Presenting a defense to a state enforcement action does have an effect on the
government, but the effect does not invade sovereign immunity, so it is
unnecessary to ignore an impermissible effect through a fiction. Although the
Court's opinion in *Young* does not adopt this rationale explicitly, its reasoning

---

1. Osborn v. Bank of the U.S., 22 U.S. (9 Wheat.) 738, 798-99 (1824) (argument of
Mr. Clay for appellee).
2. 209 U.S. 123 (1908).

is in important ways congruent with the anti-suit explanation. Part III discusses *Young* as a precedent, explaining that for many decades it stood for the important but limited proposition that officers may be sued for injunctions against enforcement actions. It did not quickly become authority for the broader claim that officer suits may be used to obtain any form of forward-looking relief.

Part IV then asks whether *Ex parte Young* implies the existence of a novel federal cause of action, and whether it encounters the paradox that is often attributed to it. It does not. The Conclusion briefly discusses the implications of this revised reading for current issues. Understood as suggested here, *Young* does not support the claim that all prospective injunctive relief is consistent with sovereign immunity, nor the position that constitutional rules should be assumed of their own force to create causes of action to enforce them. Given the importance of the anti-suit remedy endorsed in *Young*, it is significant that the availability of that remedy has narrower implications than it may seem to.

## I. *EX PARTE YOUNG* AND ITS FICTION

### A. Ex Parte Young

In the spring of 1907, railroad rates were a major political issue in Minnesota, as in other parts of the country, and there was a confrontation between the railroads and advocates of legislation to reduce rates. Edward T. Young, the Attorney General of Minnesota, advised the Minnesota legislature on designing a package of rate reductions that would not be overturned by the courts. Acting on Young's advice, the legislature adopted a major reduction in passenger rates combined with a smaller reduction in freight rates than many advocates of rate cuts had wanted; Young believed that the combined effect would not be confiscatory and so would pass muster under existing constitutional doctrine.[3]

Young also recommended two features that would inhibit judicial review of the new rates. Aware of the Supreme Court's decision in *Fitts v. McGhee*,[4] Young drafted the bill so as to avoid giving any particular state officer specific authority to enforce the new rates.[5] If his reading of *Fitts* was correct, that would remove an avenue by which the railroads could bring suit to challenge the rates. If the railroads were unable to become plaintiffs, their other avenue would be to violate the rates and litigate as defendants in an enforcement proceeding. In order to deter that mode of review, the legislation imposed

3. RICHARD C. CORTNER, THE IRON HORSE AND THE CONSTITUTION 144-45 (1993).
4. 172 U.S. 516 (1899).
5. CORTNER, *supra* note 3, at 145. *Fitts* had held an officer suit barred by sovereign immunity and could be read to have rested on the fact that the defendant had no specific duty to enforce the law in question. *See id.*

*STANFORD LAW REVIEW* [Vol. 60:989

severe penalties for violations, including criminal penalties for railroad employees.[6] The railroads and their officers thus would be running a grave risk if they disregarded the rates in order to set up litigation: if Young was right about the constitutional issue, the railroads' defense would be unavailing and they would be subject to heavy penalties.

It seemed for a while that the combination of moderation on substance and firmness on remedy would succeed; initial indications were that the railroads would comply with the new rates and not seek a means of challenging them in court.[7] Not everyone with a stake in the railroads' profitability was satisfied, however, including some major shareholders.[8] After some negotiation and maneuvering, on May 31, 1907, shareholders in each of the railroads covered by the rates brought derivative actions in the federal circuit court, seeking injunctions against compliance with the rates on the grounds that they were unconstitutional under the Due Process Clause of the Fourteenth Amendment and the Commerce Clause.[9] The suit that gave its name to the circuit court litigation was brought by Charles F. Perkins against the Northern Pacific.[10]

In addition to suing their corporations, the shareholders sued Attorney General Young, asking for an injunction against enforcement of the rates. District Judge William Lochren, holding the circuit court, issued a temporary restraining order the day the suit was filed, directing Young not to enforce the rates.[11] On July 2, with the temporary restraining order in effect but before Judge Lochren had decided whether to grant a preliminary or permanent injunction, Attorney General Young filed a motion to dismiss the suit against him on grounds of sovereign immunity, a motion that Judge Lochren rejected after argument on July 8 and 9.[12] On September 20 Lochren issued a preliminary injunction against enforcement of the new commodity rates, though not of the merchandise or passenger rates.[13]

---

6. *Id.*

7. *Id.* at 145-46. "Under these circumstances, a fragile peace on railroad rates appeared to have been secured in Minnesota." *Id.* at 146.

8. One such shareholder was John S. Kennedy of New York, who owned about $17,000,000 in shares of railroads subject to the new rates. *Id.* at 155.

9. *Id.* at 155-57. As Cortner notes, pursuant to the federal equity rules as they then stood, the shareholders first made demands on management that the corporations not comply. Only when those demands were rejected were the shareholders free to sue to assert their corporations' rights against management. *Id.* at 156.

10. *See* Perkins v. N. Pac. Ry. Co., 155 F. 445 (C.C.D. Minn. 1907). One of the suits was Kennedy's proceeding against the Great Northern, in which he was represented by Pierce Butler. CORTNER, *supra* note 3, at 156.

11. CORTNER, *supra* note 3, at 157. Young apparently felt sandbagged by the derivative suit, especially because he had returned to Minnesota's Treasury much of a special appropriation that had been passed for his office in anticipation of extensive litigation over the rate reduction. *Id.* at 157-58.

12. *Id.* at 161-62.

13. *Perkins*, 155 F. at 455-56. Judge Lochren reasoned that the cumulative effect of the rates was likely to be confiscatory and that the commodity rates should be suspended as they,

Judge Lochren's order was still not a permanent injunction. Extensive fact-finding, probably before a special master, would be required before a final decision could be reached.[14] But as the federal jurisdictional statutes then stood there was appellate review only of final judgments. Faced with a long delay before he could bring the sovereign immunity issue before the Supreme Court, Young decided to put himself in contempt of the circuit court's order. On September 24, 1907, he filed a state court mandamus action against the Northern Pacific.[15] After more maneuvering, the Northern Pacific shareholder plaintiffs in *Perkins* moved the circuit court to hold Young in contempt.[16] Judge Lochren did so on October 21, directing that the United States marshal take Young into custody until he purged himself of the contempt by withdrawing the mandamus action, and fining him $100.[17] Young was required to report to the marshal once a day.

Now that he was in federal custody pursuant to an order of a lower court, Young was able to petition the Supreme Court for the so-called original writ of habeas corpus, an action that is original in form but appellate in substance, because it is used to review the decision of a lower court. Thus the eponymous lawsuit here is not the primary proceeding, *Perkins*, but a new one named after the defendant in the circuit court who became petitioner in the Supreme Court: *Ex parte Young*.

After extensive briefing and two days of argument in December 1907, the Supreme Court decided that case in March 1908.[18] Justice Peckham, writing for the Court, had a series of issues to resolve. First, he concluded that there was federal question jurisdiction in *Perkins* (the parties were not completely diverse), identifying a number of issues of federal law raised in the proceeding.[19] He then turned to one of the merits questions: whether the penalties, designed to inhibit challenge to the rates through a defensive proceeding, were unconstitutional. He concluded that they were inconsistent with the requirements of due process because of the burden they placed on access to the courts.[20]

---

unlike the other two, had never gone into effect, his temporary restraining order having been issued before their effective date. *Id.*

14.  CORTNER, *supra* note 3, at 170.

15.  *Id.*

16.  *Id.* at 170-75.

17.  *Id.* at 175-76.

18.  209 U.S. 123 (1908).

19.  *Id.* at 143-45.

20.  Justice Peckham wrote:

We hold, therefore, that the provisions of the acts relating to the enforcement of the rates, either for freight or passengers, by imposing such enormous fines and possible imprisonment as a result of an unsuccessful effort to test the validity of the laws themselves, are unconstitutional on their face, without regard to the question of the insufficiency of those rates.

*Id.* at 148.

Having reached the merits first, perhaps to make the opinion more persuasive, Peckham turned to the question of the circuit court's jurisdiction in *Perkins* in light of sovereign immunity. He conducted a lengthy review of the Court's cases,[21] beginning with *Chisholm v. Georgia*[22] and continuing through more recent cases like *Fitts v. McGhee*,[23] on which Young had relied in drafting the Minnesota legislation.

After concluding that sovereign immunity did not block relief against Young, Peckham turned to another question raised by a request for an injunction: whether there was an adequate remedy at law. The railroads' remedy at law, the Court assumed, would be to assert a defense in an enforcement proceeding.

> It is further objected that there is a plain and adequate remedy at law open to the complainants and that a court of equity, therefore, has no jurisdiction in such case. It has been suggested that the proper way to test the constitutionality of the act is to disobey it, at least once, after which the company might obey the act pending subsequent proceedings to test its validity.[24]

But a single violation might or might not be punished, and in any event the criminal penalties would make it hard to find anyone prepared to commit the violation (just as Young had intended).[25] Moreover, the constitutional question, involving intricate facts of corporate accounting, would be hard to explain to a jury in defense in a prosecution. Much better to let the whole thing come to equity, so the remedy at law was not adequate.[26]

Concluding that Young was properly in custody because the circuit court's injunction was proper, the Court denied relief on habeas.

## B. *The* Ex Parte Young *Legal Fiction*

The Supreme Court today says that *Ex parte Young* represents an exception to principles of sovereign immunity "for certain suits seeking declaratory and injunctive relief against state officers in their individual capacities."[27] That exception "rests on a fictional distinction between the official and the State."[28]

As the Court currently understands it, sovereign immunity bars lawsuits against unconsenting states, whether the named party is the state itself or an officer whose official action the plaintiff seeks to control.[29] When only

21. *Id.* at 149-63.
22. 2 U.S. (2 Dall.) 419 (1793).
23. 172 U.S. 516 (1899).
24. *Young*, 209 U.S. at 163.
25. *Id.* at 163-64.
26. *Id.* at 164-66.
27. Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 269 (1997).
28. *Id.* (glossing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984)).
29. "[I]n the absence of consent a suit in which the State or one of its agencies or

officials are named as defendants, the bar operates if "'the state is the real, substantial party in interest.'"[30] In one situation, though, a state may be sued by suing its officials.

> The Court has recognized an important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State. This was the holding in *Ex parte Young*, 209 U.S. 123 (1908), in which a federal court enjoined the Attorney General of the State of Minnesota from bringing suit to enforce a state statute that allegedly violated the Fourteenth Amendment.[31]

*Ex parte Young* is said to be an exception to the general principle that sovereign immunity blocks suits against officials when the state is the real party in interest, so the Court must assume that in *Young* Minnesota was the real party. The *Young* exception, the Court explained in *Pennhurst*, rests on a fiction, one "accepted as necessary to permit the federal courts to vindicate federal rights."[32] The fiction is that "injunctive relief against state officials acting in their official capacity does not run against the State."[33] The fiction arose in *Young* when that case reasoned that an officer executing an unconstitutional statute is stripped of official capacity and may be dealt with as a private wrongdoer.

To be more precise, the fiction consists of ignoring the effect on the state, not simply in finding an effect on the officer. Sovereign immunity is about the consequences of decrees for states as such, not for officers personally. The presence of the latter is important only insofar as it affords a rationale for discounting the former. In the Court's current view, *Ex parte Young* created an exception to principles of sovereign immunity, principles that but for the exception would have barred the injunction in *Perkins*. Instead of admitting that it was creating an exception, the Court in *Young*, on this reading, denied that the injunction had an impermissible effect on Minnesota. Because that denial was false, the case employed a fiction.[34]

---

departments is named as the defendant is proscribed by the Eleventh Amendment. . . . This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst*, 465 U.S. at 100 (citations omitted).

    30. *Id.* at 101 (quoting Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 464 (1945)).

    31. *Id.* at 102 (parallel citation omitted).

    32. *Id.* at 105.

    33. *Id.* at 114 n.25. The description of the *Young* fiction in *Pennhurst* is embedded in the majority's response to Justice Stevens' dissent, which the majority criticizes as taking the *Young* fiction as if it were fact. "The dissent's method is merely to take this fiction to its extreme." *Id.*

    34. That is also the view of leading commentators. "However desirable the result in *Ex parte Young*, the Court's theory rests on a fictional tour de force." PETER W. LOW & JOHN C. JEFFRIES, JR., FEDERAL COURTS AND THE LAW OF FEDERAL-STATE RELATIONS 937 (5th ed. 2004).

## II. *YOUNG* AND SOVEREIGN IMMUNITY

Minnesota was in a substantial and practical sense a party in Perkins' suit against the railroads and Attorney General Young. But while the State was for practical purposes a party, it was not so in a way that violated the principle of sovereign immunity. Because the plaintiffs sought an anti-suit injunction that would enforce a defense against the state, the suit in which Minnesota was in substance a party was also one in which Minnesota was in substance the plaintiff and the railroads were the defendants. Asserting a defense against a government does not offend its sovereign immunity. The holding of *Young* as to sovereign immunity was thus correct, without any need for a fiction. While the Court's opinion did not explicitly discuss the doctrine governing anti-suit injunctions, it analyzed the case in a fashion appropriate to that remedy, not in a fashion appropriate to a suit to enjoin a tort. In other ways too, the Court's reasoning is compatible with the argument that relief against Young was permitted by sovereign immunity because that relief was nothing more than the recognition of a defense against the state.

### A. *Anti-Suit Injunctions and Sovereign Immunity*

The injunction in *Perkins* had an effect on Attorney General Young himself and, through him, the State of Minnesota. The effect on Young personally, which led to his being taken into somewhat nominal custody and fined, was permissible under long-standing principles governing suits against government officers. It was the effect on Minnesota that created the problem.

As to Young considered as an individual, it was a familiar feature of American constitutional law that a government officer who was carrying out an unconstitutional statute was not entitled to the privileges to act and protections from judicial remedies, accorded to officers when they executed valid laws. On this point the Supreme Court's leading precedent was *Osborn v. Bank of the United States*,[35] which had upheld an injunction against Ralph Osborn, Auditor of Ohio, that interfered with his plan to carry out an unconstitutional statute. Ohio had imposed a tax on the Bank of the United States which the Bank said was unconstitutional under *M'Culloch v. Maryland*.[36] Osborn announced that he would collect the tax anyway, indicating that he was prepared to seize specie and notes held in the Bank's vaults. The Bank applied to the federal circuit court for an injunction against the seizure, which the court granted. Osborn sent an agent to break into the Bank anyway, and the circuit court then ordered him and the other Ohio officers involved to return the funds, which had been stored separately from other assets of the State.[37]

---

35. 22 U.S. (9 Wheat.) 738 (1824).
36. 17 U.S. (4 Wheat.) 316 (1819).
37. *Osborn*, 22 U.S. (9 Wheat.) at 739-44.

Chief Justice Marshall, writing for the Court, concluded that both the initial injunction and the order to return the Bank's property were consistent with Ohio's sovereign immunity. Osborn could not justify his trespass with official authority, because the statute he was enforcing was invalid.[38] He was thus stripped of official privilege and could be treated as a private citizen who threatened and then committed an unlawful invasion of another private person's rights.

That conclusion was the easy part of *Osborn*. Personal liability of officers for wrongful acts in excess of their authority was a standard feature of American public law, and of the English system from which it was derived. It was accepted on all sides that Osborn would be liable for damages, paid from his private funds, if his invasion of the Bank's rights proved to rest on invalid official authorization. Indeed, Osborn argued that the damages remedy against him and the other officers (and of course not against Ohio, which had sovereign immunity) was adequate, so that the injunction was not called for under equitable principles.[39]

Attorney General Young does not seem to have argued that he could block the injunction against him on grounds of official privilege. Privilege would be available only if the rates were valid. Insofar as it was making this point when it discussed Young's status as being like that of a private wrongdoer, the Court was affirming a standard principle. The effect on Young was quite real, and explaining why it was permissible did not involve any fictions; Minnesota may or may not have been a defendant, but Edward Young certainly was. Justifying that was not hard. Young's real argument, and the issue with which the Court genuinely had to grapple, concerned the injunction's effect on the state.

In order to see why the injunction in *Perkins* did not seriously compromise the state's sovereign immunity, and so did not need to ignore the effect on the state through a fiction, it is important to understand that the lower-court proceeding against Young involved that staple of equity, the bill to restrain proceedings at law.

A core function of equity, and a classic use of the remedy of injunction, especially in systems that separated law and equity, was to interfere with proceedings at law by enjoining parties from bringing legal actions, from raising certain claims or defenses in them, or from executing judgments obtained at law.[40] In one standard configuration a potential defendant at law would sue in equity in order to present a defense that was not recognized at law, or would be inadequately protected by being raised as a defense in a legal

---

38. *Id.* at 839.

39. *Id.* at 841-42.

40. "The use of injunctions to stay actions at law was almost coeval with the establishment of the chancery jurisdiction. Without this means of interference to protect the rights of its suitors, the court of chancery could never have established, extended, and enforced its own jurisdiction." 4 John Norton Pomeroy, Jr., Equity Jurisprudence § 1360 (3d ed. 1905).

proceeding.[41] With the injunction in place, bringing the action at law would be punishable as contempt of the equity court.[42] Equity courts sometimes would go beyond just restraining proceedings at law, granting additional remedies, such as cancellation of an instrument under which the equity plaintiff might be sued.[43] Equitable relief thus could be granted to equity plaintiffs who would be, or were, defendants at law.[44]

Crucial to understanding *Young* is that injunctions to restrain proceedings at law were sometimes granted to enforce defenses that could be raised at law but the assertion of which would nevertheless not afford the equity plaintiff full protection.[45] If the bill in equity could explain why the legal defense, even

---

41. Pomeroy wrote:

It is no exaggeration to say that, during its formative periods, the equitable jurisdiction was built up through the instrumentality of the injunction restraining the prosecution of legal actions, where the defendants sought the aid of chancery, which alone could take cognizance of the equities that would defeat a recovery at law against them.

*Id.* As Pomeroy explained, it was not enough for the plaintiff in equity to show a valid legal defense; there had to be some reason that simply raising the defense at law was not possible or was not enough. *Id.* § 1361. For example, a defense that was recognized only by the equity courts could give rise to an injunction against proceeding at law, as the remedy at law was inadequate because non-existent. *Id.* § 1362.

Commentators well understood that suits to enjoin proceedings at law were a substitute for a defense at law, and so were available only when the legal remedy was not enough. According to Bates, the injunction to restrain proceedings at law was not available where the "defendant in the action at law and plaintiff in the suit in equity has a perfect and complete legal defense, unless there are special circumstances which constitute a ground of equity and show that he cannot make his legal defense available at law." 1 C.L. BATES, FEDERAL EQUITY PROCEDURE § 540 (1901).

42. Equity courts and commentators on equity were at pains to point out that equity never interfered with other courts. The injunction ran, not to the law court itself, but to the potential party in the law court.

There does not seem to be any just foundation for the opposition of the Courts of Common Law to this [equitable] jurisdiction. A writ of injunction is in no just sense a prohibition to those courts in the exercise of their jurisdiction. It is not addressed to those courts. It does not even affect to interfere with them. The process, when its object is to restrain proceedings at law, is directed only to the parties.

2 JOSEPH STORY, EQUITY JURISPRUDENCE § 875 (Melville M. Bigelow ed., 13th ed., Boston, Little, Brown, and Co. 1886) (footnote omitted).

43. Pomeroy wrote:

[E]quity will enjoin the action at law, and will determine the whole cause, whenever the legal remedy is inadequate; and the legal remedy is deemed to be inadequate if the ends of justice would not be satisfied by a mere judgment for the defendant in the action at law, but would require that some distinctively equitable relief, such as a cancellation or a reformation of the instrument sued upon, be conferred upon him. If any affirmative equitable relief is necessary to a full settlement of the controversy, and to a complete protection of the defendant's rights, a court of equity will interfere, entertain a suit for such relief, and enjoin the action at law.

4 POMEROY, *supra* note 40, § 1363, at 2706.

44. Plaintiffs at law also sometimes needed to resort to equity for an injunction against raising a defense. If a fraudulently obtained agreement such as a release would constitute a defense at law, the plaintiff at law could first sue in equity and obtain an injunction against raising the defense.

45. "There are numerous instances where a defendant has a good defense to an action at law, which, by mistake, accident or fraud of the other party, he is prevented from making.

though technically available, would not do full justice, then the defense at law would constitute a legal remedy that was inadequate, and equity could act. Story devoted several sections of his treatise on equity jurisprudence to describing situations in which a legal defense was inadequate and an injunction against bringing the lawsuit was appropriate.[46] Not only potential, but actual, defendants at law could become plaintiffs in equity. A defendant who had lost a legal action because of fraud by the plaintiff could obtain an injunction against the execution of the judgment.[47]

That equity enabled potential legal defendants to assert their defenses preemptively was an established feature of federal equity as overseen by the Supreme Court. Decades before *Young*, the Court decided *Phoenix Mutual Life Insurance Co. v. Bailey*,[48] an equity suit seeking cancellation of an insurance policy allegedly obtained by fraud. The Court found that the bill was properly dismissed, without prejudice to the equity plaintiff's claims on their merits, because the defense of fraud was available at law if the plaintiff insurance company was sued on the policies.

> Where a party, if his theory of the controversy is correct, has a good defence at law to a "purely legal demand," he should be left to that means of defence, as he has no occasion to resort to a court of equity for relief, unless he is prepared to allege and prove some special circumstances to show that he may suffer irreparable injury if he is denied a preventive remedy. Nothing of the kind is to be apprehended in this case . . . .[49]

The Court understood clearly that a plaintiff in equity could be asserting a defense at law.[50]

In 1894 the Court had occasion to discuss the origins of the bill to quiet title, which was created so that the defendant in a series of actions in ejectment could obtain relief through an injunction against further legal proceedings.[51] The purpose was "preventing the party in possession being annoyed by repeated and vexatious actions," and was "only another exercise of the familiar

---

In all these cases equity will interpose, and make the defense available." JOHN WILLARD, A TREATISE ON EQUITY JURISPRUDENCE 446 (Platt Potter ed., 2d ed., New York, Banks & Brothers 1875). The section in which that passage appears is titled, "Of Injunctions to Restrain Proceedings in Other Courts." *Id.* at 441.

46. 2 STORY, *supra* note 42, §§ 877-883a.

47. 4 POMEROY, *supra* note 40, § 1364, at 2708.

48. 80 U.S. (13 Wall.) 616 (1871).

49. *Id.* at 623.

50. Slightly earlier in the opinion, the Court explained:
Equity will rescind or enjoin such instruments [obtained by fraud] where they operate as a cloud upon the title of the opposite party, or where the instruments are of a character that the vice in the inception of the same would be unavailing as a defence by the injured party if the instruments were transferred for value into the hands of an innocent holder. . . .
   . . . [B]ut the rule in the Federal courts is universal, that if the defendant has a good defence at law, and the remedy at law is as perfect and complete as the remedy in equity, an injunction will not be granted.
*Id.* at 622.

51. *See* Wehrman v. Conklin, 155 U.S. 314, 321-22 (1894).

*STANFORD LAW REVIEW* [Vol. 60:989]

power of a court of equity to prevent a multiplicity of suits by bills of peace."[52] Bills of peace and to quiet title were brought by potential defendants at law. The Court went on to assess the availability of an injunction against ejectment proceedings by evaluating the adequacy of the equity plaintiffs' defense in such a proceeding as their remedy at law.[53] The equity plaintiffs were using the suit to enjoin legal proceedings as a means of asserting defenses.[54]

The contemporary reader will be struck by the resemblance between anti-suit injunctions and declaratory judgments: both are used by potential defendants to become plaintiffs and assert defenses without waiting to be sued. That resemblance is very real, and is no accident. Professor Edwin Borchard of the Yale Law School, principal advocate of state and federal legislation to provide for declaratory judgments, regarded them as an improved form of the suit to restrain legal proceedings.[55] Declaratory judgments often performed the function of injunctions, but were not subject to the technical rules regarding the availability of equitable remedies.[56] For example, a declaratory judgment often would be available even when the declaratory plaintiff could not show the kind of imminent and irreparable injury required for an injunction.[57]

The railroads in *Perkins* were thus using a familiar mode of proceeding by which a potential defendant at law could sue in equity and present a legal position that would be a defense at law. Because their position was a defense, not an affirmative claim on the State of Minnesota, a court could grant relief without offending sovereign immunity. Indeed, as sovereign immunity problems go this one was relatively easy. Whatever sovereign immunity means exactly, it does not mean that the government necessarily wins when it sues a private person. No one denied that if the railroads and their officers violated the Minnesota rates and were prosecuted, they would be entitled to raise as defenses all the arguments the courts considered in *Perkins* and *Young*. If one of those defenses prevailed, the defendants would have a judgment against the state with preclusive effect, so preclusive that another prosecution would constitute double jeopardy. Sovereign immunity cases had always treated defenses against the government as unproblematic. In *Cohens v. Virginia*,[58] when Virginia argued that its sovereignty was invaded by a writ of error to the Supreme Court of the United States, it did not argue that sovereign immunity precluded the Cohens from raising their federal defenses when they were prosecuted in state court.

---

52. *Id.* at 322.

53. *Id.* at 325-29.

54. *See also* Deweese v. Reinhard, 165 U.S. 386, 389 (1897) (noting that a suit to enjoin action in ejectment cannot be sustained where the equity plaintiff has a full and adequate defense at law).

55. EDWIN BORCHARD, DECLARATORY JUDGMENTS 186-87 (1934).

56. *Id.* at 170-71.

57. *Id.* at 247.

58. 19 U.S. (6 Wheat.) 264 (1821).

It is quite possible that the relief the railroads sought was in one important respect even less intrusive than the relief they would have been entitled to as defendants. Young, not Minnesota, was the named party, so it was not clear that the judgment against Young would have preclusive effect in a later suit in the name of the state. If it would have, that would have been a bonus for the railroads, but they did not really need it. The power of equity courts had long rested on their ability to coerce people through their contempt power, and if needed that authority was present with respect to Young personally.

Because the railroads' complaint in *Perkins* did not name Minnesota as a defendant, it was consistent with a purely formal principle that a State may not be made a defendant on the record. Sovereign immunity, as understood in 1908 and today, may include such a formal principle, derived ultimately from ideas about personal jurisdiction.[59] While cases involving suits against officers often formulated sovereign immunity as a principle governing the effect on the state, a principle that goes beyond formalities of pleading, those were all cases in which the State had not been named as a party. They thus stand for the proposition that sovereign immunity is not limited to protecting states from being defendants on the record, not for the proposition that it provides no such formal protection. The railroads' suit against Young was neither formally nor substantively offensive to Minnesota's immunity from suit, so the result in *Young* is consistent with a continuing rule that a state not be named as a defendant without its consent.

Whatever the status of the rules governing pleading formalities may be, sovereign immunity is mainly about the substance of a decree's effect on a state. That is why suing an officer like Young and not the State of Minnesota as such, which avoided the formal difficulty, did not by itself meet the sovereign immunity objection. Courts must look behind the form to the substance. But in doing so they must look all the way behind, and inquire into the actual effect on the state of a suit that is nominally against an officer. A suit seeking an order that an officer make a payment from the state treasury is indeed really one in which the state is a defendant, because the nominal plaintiffs seek affirmative relief. In *Perkins*, however, the nominal plaintiffs wanted nothing more from the State than to be let alone; in more formal legal terms, they sought to assert a defense, not a claim for affirmative relief.

One could say that whether or not there was a fiction in *Ex parte Young*, there was a fiction in *Perkins*. The fiction was that the railroads, as represented by their shareholders, were the plaintiffs. They were actually defendants.

---

59. The origins of sovereign immunity in principles that today would be called personal jurisdiction, and the continuing influence of that understanding of the doctrine, are set out in Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559 (2002).

B. *Anti-Suit Injunctions, Negative Relief, and the Opinion in* Young

Justice Peckham did not make this argument in *Young* (nor did any of the briefs), but traces of the anti-suit nature of *Perkins* can be found once one knows to look for them. According to the conventional account, Justice Peckham treated the institution of enforcement proceedings as a private tort.[60] This is thought to be a problem because at the time there was no such tort.[61] But Justice Peckham asked the questions appropriate to an anti-suit injunction, and not to an injunction against a tort, in deciding whether the railroads had an adequate remedy at law. As the adequacy of the remedy at law is a fundamental question in any suit for an injunction, that analysis was central to the Court's reasoning.

To apply the familiar principle that equity will act only when the remedy at law is inadequate, the court must identify the legal remedy. Peckham discussed the question in detail, giving several grounds on which it would be unreasonable to demand that the railroads violate the rates, wait to be sued by Minnesota, and present their federal arguments as defenses.[62] The remedy at law for which the injunctive suit was a substitute was a defense. The Court used the analysis appropriate to an anti-suit injunction, although it did not explicitly note that it was doing so.

Had Justice Peckham really understood the institution of enforcement proceedings as a tort, he would have asked whether damages against Young personally would have been an adequate remedy at law. How he would have dealt with the problem that damages generally were not available against someone who simply had filed a lawsuit is hard to say. Perhaps that would have meant that the legal remedy was inadequate, or perhaps focusing on the question would have led Peckham to realize that he was barking up the wrong tree. Instead, he had started at the right tree, though he did not explain why.

Asking whether damages against Young would be an adequate legal remedy might have led Peckham, and hence subsequent readers of his opinion, to focus on the difference between the remedy in *Perkins* and that in *Osborn*. In

---

60. "Justice Peckham acknowledged that the officer could be sued only if personally liable, but asserted without explanation that the threat of suit under an unconstitutional statute was 'equivalent to any other threatened wrong or injury to the property of the plaintiff.'" DAVID P. CURRIE, THE CONSTITUTION IN THE SUPREME COURT: THE SECOND CENTURY, 1888-1986, at 52 (1990) (quoting *Ex parte* Young, 209 U.S. 123, 158 (1908)).

61. "But even today only *malicious* prosecutions are actionable, and at the time of *Young* the tort had apparently not been extended to civil cases at all." *Id.* at 52 n.174.

62. *Ex parte* Young, 209 U.S. at 163-65. Explaining why a court of equity was better suited to determine the question whether the rates were confiscatory, Peckham expressed no doubt that the point could also be raised by way of defense.

> We do not say the company could not interpose this defense in an action to recover penalties or upon the trial of an indictment . . . , but the facility of proving it in either case falls so far below that which would obtain in a court of equity that comparison is scarcely possible.

*Id.* at 165 (citation omitted).

analyzing the propriety of the injunction in *Osborn*, the Supreme Court recognized that the legal remedy against Osborn would be an action for damages. Indeed, the defendants in the earlier case granted that they were personally responsible in damages, and said that therefore no injunction was needed.[63] The railroads did not ask for damages after Young instituted the mandamus proceeding. Doing so was not a tort or other private wrong, unlike the officers' actions in *Osborn*, and no damages would have been available.

Another trace of the anti-suit nature of *Perkins* is found at the very end of *Young*. After explaining that federal courts had been exercising "jurisdiction of this general character" ever since *Osborn*,[64] Justice Peckham gave as further examples of permissible suits against officers a line of habeas cases.[65] In some of them "persons in the custody of state officers for alleged crimes against the State have been taken from that custody and discharged by a Federal court or judge, because the imprisonment was adjudged to be in violation of the Federal Constitution."[66]

One of Peckham's illustrations was *Cunningham v. Neagle*.[67] Neagle, a deputy U.S. marshal, had shot and killed David Terry while acting as a bodyguard for Justice Field. A California sheriff arrested Neagle for murder, and Neagle claimed justification from his federal authorization. Rather than just present his defense in the California prosecution, Neagle brought a habeas corpus proceeding against his jailer and asserted his federal defense collaterally.[68] When the Supreme Court concluded that Neagle was correct on the merits, it ordered him released from state custody.[69] *Neagle* was an officer

---

63. Osborn and the other defendants below, appellants in the Supreme Court, admitted their liability at law, and made that an argument against the injunction, claiming that damages against them personally would be adequate relief. Osborn v. Bank of the U.S., 22 U.S. (9 Wheat.) 738, 839 (1824). The Court agreed that damages could be calculated in a legal action by the Bank against the officers, but thought equitable relief nevertheless to be superior. *Id.* at 841–42; *see also id.* at 843 ("[T]he appellants acknowledge that an action at law would lie against the agent [of a principal who could not be sued], in which full compensation ought to be made for the injury.").

64. *Young*, 209 U.S. at 167.

65. *Id.* at 167-68.

66. *Id.* at 168.

67. 135 U.S. 1 (1890).

68. Neagle did not argue that the California murder statute under which he had been charged was unconstitutional. He argued that federal law authorized him to fire on Terry and so provided him with a good defense in a murder prosecution.

69. The Court understood that the habeas proceeding was being used to try issues that otherwise would have been adjudicated in Neagle's criminal trial in California court. It rejected California's argument that habeas was therefore an inappropriate form of relief:

> To the objection made in argument, that the prisoner is discharged by this writ from the power of the state court to try him for the whole offence, the reply is, that if the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the State of California. When these things are shown, it is established that he is innocent of any crime against the laws of the State, or of any other

*STANFORD LAW REVIEW*

suit with a significant effect on the State, yet the Court did not even notice a problem of sovereign immunity, and in *Young* relied on the earlier case as unproblematic. *Neagle* was also an officer suit in which a private individual who was formally the plaintiff relied on a legal advantage that was a defense against the State.

*Neagle* did involve confinement, which is a trespass if committed without official authority, and in that respect it resembled *Osborn* and not *Perkins*. But it did not fit the officer-stripping template of *Osborn*, because Neagle did not argue that he was held pursuant to an invalid statute. Rather, Neagle presented, in considerable circumstantial detail, a defense to the charge of murder. Presenting that defense in a federal court through habeas did not offend the sovereignty of California any more than presenting it in the state prosecution would have.

Another habeas petitioner who was not required to present his federal defense in state court was James H. Wood, plaintiff in the case that follows *Young* in the *United States Reports* and that was decided on the same day, *Hunter v. Wood*.[70] Wood, a Southern Railway Company ticket agent, was arrested for overcharging a customer in violation of the rates set by North Carolina. The federal circuit court had enjoined the Attorney General of North Carolina from enforcing the rates in a suit much like *Perkins*. The circuit court, on Wood's habeas petition, ordered him released, and the Supreme Court affirmed, citing *Neagle*.[71] No harm was done to sovereign immunity, as both Wood and the Southern Railway were substantially defendants, though formally plaintiffs, in their respective officer suits.

Behind *Perkins*' character as an anti-suit proceeding was the nature of the railroads' constitutional argument, which in turn explains some of the parts of *Young* that seem most fictionalized to today's readers. The railroads' defense, brought before the court through the anti-suit mechanism, was that the rates were unconstitutional and therefore invalid. They sought to enforce the principle that the Constitution limits the powers of government and therefore operates through nullification, and they sought nothing more. That is why Justice Peckham concluded that their suit presented no threat to sovereign immunity.

Peckham's fundamental point, throughout the discussion of sovereign immunity, was that the only effect of the injunction on the State of Minnesota was to treat as invalid an unconstitutional enactment. No affirmative demand was being made for damages or for performance of a contract or an official

---

authority whatever. There is no occasion for any further trial in the state court, or in any court. The Circuit Court of the United States was as competent to ascertain these facts as any other tribunal, and it was not at all necessary that a jury should be impaneled to render a verdict on them.

*Neagle*, 135 U.S. at 75.

    70.  209 U.S. 205 (1908).

    71.  *Id.* at 210.

duty. The effect was wholly negative because it enforced a conclusion of invalidity, making a purported law into a non-law.

Peckham expressed that point in terms familiar to students of judicial review. The supposed state action being interfered with was no state action at all, because it was invalid. Because no state action was being impeded by the injunction, there was no effect on the State and the State was not a party. Contemporary readers perhaps would be less confused if he had said instead (as I have) that the effect of the injunction on the State was real but permissible, because that effect was simply to endorse a defense based on the invalidity of an unconstitutional law. But to say that a purported action of the State is invalid is the same thing as to say that there has been no action of the State at all, just as it is the same to say that an unconstitutional law is an invalid law and to say that it is no law at all. And for that last formulation Peckham had the most respectable authority in American constitutional law.[72]

The passages in which Peckham denied that there was any state action to be interfered with are not fictionalization, just a way of expressing his message. Probably the best-known passage in *Young*, and a proof-text for the legal-fiction reading, is this:

> The answer to all this is the same as made in every case where an official claims to be acting under the authority of the State. The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional.[73]

The injunction does not affect the State in its sovereign or governmental capacity first because there is no valid law involved and second because nothing is being demanded but the recognition of that fact.

This is why Justice Peckham could say of *Osborn* and *Young* that "[t]he sovereignty of the State is, in reality, no more involved in one case than in the other."[74] Readers today may chuckle, and think that the sovereignty of the State is involved in both. But in both cases there was only a purported, not a real, act of the State, and so its sovereignty was not interfered with when the

---

72. Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803).

73. *Ex parte* Young, 209 U.S. 123, 159 (1908). This passage was a response to an argument formulated in the preceding paragraph:

> It is contended that the complainants do not complain and they care nothing about any action which Mr. Young might take or bring as an ordinary individual, but that he was complained of as an officer, to whose discretion is confided the use of the name of the State of Minnesota so far as litigation is concerned, and that when or how he shall use it is a matter resting in his discretion and cannot be controlled by any court.

*Id.* The plaintiffs argued that the effect of the injunction was on Minnesota, not Young. Justice Peckham denied that, replying that Minnesota was not present, there being no valid exercise of its governmental power to be interfered with.

74. *Id.* at 167.

*STANFORD LAW REVIEW* [Vol. 60:989

officer was enjoined. Because all they were doing was asserting a principle of nullity, the private plaintiffs in both of those suits were making no demand on state power other than to be let alone to enjoy their private rights. In *Osborn*, those were the property rights of the Bank, good against Osborn personally once he was stripped of governmental power. In *Perkins* the railroads' posture was equally defensive, both in terms of litigation positions and in a more fundamental sense, as they too sought only to enjoy their ordinary rights of property and contract, free of unconstitutional limitations thereon.

Justice Peckham contrasted the wholly negative effect of the injunction in *Perkins* with other remedies that he said would demand something from the State, would control its sovereign authority, and would violate the principle of sovereign immunity. Peckham distinguished *In re Ayers*,[75] which found that an action against the Attorney General of Virginia was barred by sovereign immunity. The injunction against collecting taxes in that case "was declared illegal because the suit itself could not be entertained as it was one against the State to enforce its alleged contract."[76] The problem in *Ayers* was the demand for specific performance, not the injunction against collection per se: "It was said, however, that if the court had power to entertain such a suit, it would have power to grant the restraining order preventing the commencement of suits."[77]

Similar reasoning appears in a passage in *Young* responding to the argument that Minnesota had not imposed on its Attorney General any ministerial duty concerning enforcement that could legitimately be controlled by the judiciary through mandamus. Without consent from the State, the argument went, any judicial order would impermissibly interfere with Young's discretion. Peckham answered:

> There is no doubt that the court cannot control the exercise of the discretion of an officer. It can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action. . . .
>
> The general discretion regarding the enforcement of the laws when and as he deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment to the injury of complainant. In such case no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do.[78]

Directing an affirmative act would be a problem, but the injunction below did not do so.[79]

---

75. 123 U.S. 443 (1887).

76. *Young*, 209 U.S. at 152.

77. *Id.* at 152-53.

78. *Id.* at 158-59.

79. The claim that the fundamental distinction underlying *Ex parte Young* is between affirmative and negative relief rests on good authority. "Lower federal courts may *prohibit* state officers, in their individual capacity, from taking action under color of office in violation of law. But an action to compel the performance of an affirmative act would

In Justice Peckham's view, sovereign immunity was not offended when a judicial decree did nothing but enforce nullity. The anti-suit nature of the proceedings in *Perkins* thus provides, not just a justification for the result in *Young*, but an actual explanation of the Justices' reaction to the case. Peckham saw that the railroads sought to present a defense; treating the defense as the remedy at law made that clear. The defense was based on nullity and nothing more. Sovereign immunity permitted that, although it forbade affirmative relief. Even if the Justices did not focus on the fact that *Perkins* fell into a well-recognized category of equitable proceeding, the features of the case that put it into that category figured in their decision.

Nullity was crucial to Justice Peckham's reasoning, as it is crucial both to the functionally defensive nature of the railroads' position and to the fact that the litigating position they sought to vindicate in the equitable proceeding was a defense. Seeing that point requires some careful thought in part because Justice Peckham's way of putting it can be confusing. Why did he say that the State was not involved, rather than saying that there was an effect on the State but that it was permissible, because it was no more than nullification? *Ex parte Young* was not just a struggle about railroad rates. It was about judicial review, and about the role of the courts. That is how it was widely understood throughout the country.[80] Under those circumstances, formulations derived from *Marbury* must have been very appealing to judges. By saying, not just that there was no valid law but that there was no law at all, the Court invoked the superior power of the people, expressed in the Constitution, and denied that power to the people's agents in the government. It thereby undercut the claim of Young and the Minnesota state legislature that they spoke for the people against interfering federal courts. Characterizing Young as an unauthorized agent negated his claim, not only to legal authority, but to political and moral authority.

The Court's formulation in *Young* was both a standard way of expressing the principle of nullity and a form of argument well-suited to the situation. It

---

encounter, ordinarily, the bar of the Eleventh Amendment." Henry M. Hart, Jr., *The Relations Between State and Federal Law*, 54 COLUM. L. REV. 489, 516 (1954) (footnote citing *Ex parte* Young omitted).

80.  The year 1907, in which "[a] veritable flood of legislation" limiting railroad rates was adopted across the country, turned out to be a year of "rancorous confrontation involving the states, the railroads, and the federal judiciary." CORTNER, *supra* note 3, at 135. In September, Young spoke at a meeting of state attorneys general called by the Attorney General of Missouri "to address the issue of federal judicial interference with state regulatory policies." *Id.* at 172. He said,

> "[W]e are . . . confronted in the struggle now going on between the corporations and the states, with a few of the incumbents of the inferior federal courts who seem to entirely misunderstand the relations between the two governments, and the extent of their own powers, and to be imbued with the idea that from some source there was committed to their charge, authority, whenever it seemed to them necessary, to prevent the exercise by the states of their constitutional powers."

*Id.*

was rhetoric but also a true statement. Some people, when they see a figure of speech used for rhetorical purposes, apparently assume they must be reading fiction.

### III. *YOUNG* AS APPLIED DOCTRINE

To say that anti-suit injunctions are consistent with sovereign immunity when sought by potential defendants is not to say that injunctions generally are consistent with sovereign immunity. *Ex parte Young* itself involved an anti-suit injunction, but if it was understood more broadly when decided, my argument is of limited importance, as it happens to justify what the Court did in that particular case, but not the doctrine it announced.

If the Justices who decided *Young* thought that they had approved anything other than anti-suit injunctions, they forgot and did not tell their successors. Immediately after it was decided, and for decades to come, *Ex parte Young* stood for the proposition that sovereign immunity did not bar lawsuits, like *Perkins*, in which a potential defendant in an enforcement action sought an injunction against that action. It was also cited in *Osborn*-like cases in which a government officer threatened a physical invasion of the private plaintiff's property rights. It was not relied on to support the proposition that officer suits could be used to obtain prospective injunctive relief in general.[81]

Just a few years after *Young*, the Court once again rejected the use of officer suits to obtain affirmative relief from a State.

> No suit, therefore, can be maintained against a public officer which seeks to compel him to exercise the State's power of taxation; or to pay out its money in his possession on the State's obligations; or to execute a contract, or to do any affirmative act which affects the State's political or property rights.[82]

Having made that point, the Court reiterated that officers were personally liable for their torts, and an unconstitutional statute provided no defense. In addition to endorsing the *Osborn* principle, the Court cited *Young* and described it this way: "An attorney general was restrained from suing to recover penalties imposed by an unconstitutional statute."[83] *Young* authorized negative protection from lawsuits, not affirmative relief of a prospective kind.

More than forty years after it was decided, *Young* continued to be authority for the proposition that sovereign immunity permitted anti-suit injunctions but not affirmative equitable relief like specific performance. In *Georgia Railroad & Banking Co. v. Redwine*,[84] the Court found that an injunction against the assessment and collection of a tax was consistent with sovereign immunity as

---

81. This is true of cases that rely on *Young* from the time it was decided through *Edelman v. Jordan*, 415 U.S. 651 (1974).

82. Hopkins v. Clemson Agric. Coll., 221 U.S. 636, 642 (1911).

83. *Id.* at 644.

84. 342 U.S. 299, 304 (1952).

understood in *Young*. An injunction against collection, which was permissible, was to be contrasted with specific performance, which was not: "Appellant in this case merely seeks the cessation of appellee's allegedly unconstitutional conduct and does not request affirmative action by the State."[85]

Cases like *Redwine*, which denied the availability of affirmative relief, expressed the Court's understanding of the meaning of *Young* throughout the period from 1908 to *Edelman v. Jordan*. *Young* was not cited for the proposition that affirmative injunctive relief was available against state governments provided only that the relief was prospective. With a few minor exceptions, cases that relied on *Young* as setting the limits of sovereign immunity all involved injunctions against enforcement litigation, or physical enforcement actions like seizure of property to collect taxes.[86] Although the Court and individual Justices sometimes formulated the principle more broadly than that, they did not actually apply it to license anything more than what had been licensed by *Young* itself and *Osborn*.[87]

---

85. *Id.* at 304 n.15. That footnote is attached to the sentence that cites *Ex parte Young*. The Court in *Redwine* distinguished *In re Ayers*, treating the earlier case as involving a request for specific performance. *Id.* at 305. *Ayers* and *Redwine* are interesting borderline cases, because they involve contractual obligations by States not to impose taxes. Whether to regard a suit against the collection of a tax as one involving wholly negative relief, or as one for specific performance of the contract granting the tax exemption, is a nice question.

86. Many cases rely on *Young* to authorize equity suits to restrain the collection of taxes. As far as I can determine, the injunctions all ran against physical seizures and the institution of collection proceedings in court. In a few cases not involving taxes it is not entirely clear that the enforcement to be enjoined was limited to physical acts that constituted private wrongs and enforcement proceedings, but it is also not clear that it was not. The case that seems most borderline to me is *Sterling v. Constantin*, 287 U.S. 378, 403-04 (1932) (enjoining the Governor of Texas from reducing oil production). The only case I have found prior to *Edelman* in which the Court relied on *Young* to approve an injunction that clearly went beyond physical acts and bringing enforcement proceedings is *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). There the Court approved an injunction against a Rhode Island anti-obscenity commission that listed books as obscene and that could recommend, but could not itself bring, enforcement proceedings. The Court cited *Young* for the proposition that the commission's decisions were state action. (It is possible that the Justices believed that the commission's statements were the private wrong of defamation, but there is no indication of that.)

Some Justices, writing for themselves, apparently regarded the license of *Young* as extending beyond physical invasions and the institution of proceedings. Justice Black, dissenting in *Colegrove v. Green*, 328 U.S. 549, 568 (1946), asserted that the relief requested, which involved voting districts, could be granted because the suit was against the officer and not the State for purposes of sovereign immunity and relied on *Young*.

87. For example, Justice Black, writing for the Court in *Griffin v. County School Board*, 377 U.S. 218 (1964), put it this way:

The complaint, however, charged that state and county officials were depriving petitioners of rights guaranteed by the Fourteenth Amendment. It has been settled law since *Ex parte Young*, 209 U.S. 123 (1908), that suits against state and county officials to enjoin them from invading constitutional rights are not forbidden by the Eleventh Amendment.

*Id.* at 228 (parallel citations omitted).

Invasions of constitutional rights include but are not limited to enforcement actions

In keeping with the limited category of cases in which *Young* was applied as limiting sovereign immunity, the relevant remedy at law continued to be an enforcement proceeding in which the equity plaintiff would be the defendant. Thus the Justices continued to understand that the anti-suit injunction approved in that case was a means by which a potential defendant could raise a defense. In 1909 the Court rejected a challenge similar to that of the railroads in *Perkins*, citing *Young* for the proposition that equity will interpose only when the legal remedy is inadequate, and explaining that none of the equity plaintiff's supposed difficulties "would be brought about by leaving the company to its defense at law."[88] In the well-known case of *Stafford v. Wallace*,[89] the Court used the *Young* analysis in a suit against the Secretary of Agriculture challenging the Packers and Stockyards Act. In *Stafford* the Court looked to the enforcement proceeding and found, as in *Young*, that the high penalties contained in the Act made the remedy at law inadequate and equitable relief appropriate.

In succeeding decades the Court, in deciding whether equitable relief should be granted under *Young*, continued to look to the enforcement proceeding in which the equity plaintiff would be the defendant. In *Gibbs v. Buck*,[90] The American Society of Composers, Authors and Publishers sued the Attorney General of Florida for an injunction against actions under a Florida statute banning combinations of copyright-holders. The Court likened the case to *Young* because of the large fines that would be assessed were the Attorney General to prevail. In *Younger v. Harris*,[91] the Court once again showed that it understood *Young* as involving an anti-suit injunction. Applying the equitable principle that injunctions issue only to prevent irreparable injury, the Court explained:

> Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution [are not irreparable]. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution. See, e.g., *Ex parte Young, supra*, at 145-147.[92]

More than sixty years later, the Court still understood that the *Ex parte Young* injunction was a means of presenting a defense.

---

under invalid statutes. But as Justice Rehnquist pointed out in *Edelman*, the relief in *Griffin* actually involved orders to county officials, who for many decades have not been protected by state sovereign immunity. Edelman v. Jordan, 415 U.S. 651, 667 n.12 (1974).

88. Boise Artesian Hot & Cold Water Co. v. Boise City, 213 U.S. 276, 285 (1909).

89. 258 U.S. 495, 512 (1922).

90. 307 U.S. 66, 77 & n.18 (1939).

91. 401 U.S. 37 (1971).

92. *Id.* at 46.

IV. THE *EX PARTE YOUNG* CAUSE OF ACTION

A. *Fiction, Paradox, and Anti-Suit Injunctions*

The Supreme Court in *Pennhurst* said that *Young* rested on the fiction that there was no effect on the State.[93] Commentators and some courts maintain that *Young* rests on another fiction too: that the railroads had a cause of action against Young as a private wrongdoer. Justice Peckham, they suggest, narrated the facts so that *Perkins* would be like *Osborn*, but in order to do so had to fictionalize the railroads' story. Bringing a lawsuit, unlike breaking into a bank, is not a wrong, and bringing a lawsuit on behalf of Minnesota is not a private act. So in attributing a private wrong to Young the Court was simply making something up.[94]

On this account Justice Peckham was a bad writer of fiction, because his story did not even perform its function of justifying the result in *Young*. Instead, it leads to a paradox. The rule that Young was supposed to have violated was the Due Process Clause of the Fourteenth Amendment. But that provision applies only to States, as it appears in a sentence beginning "No State shall."[95] In order to have been liable, Young must have been acting for Minnesota, not just himself. Calling Young a private wrongdoer therefore undercuts the theory according to which he is liable. Calling him a private

---

93. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 104-05 (1984).

94. The idea that *Young* employed a legal fiction probably came into circulation mainly due to Kenneth Culp Davis, with some help from Charles Alan Wright. In 1958 Davis wrote in his treatise:

> Why did the Court say that an officer who acts under an unconstitutional statute is "stripped of his official or representative character"? Is he not still an officer when he is obeying what the State Legislature has officially enacted? Is he not still acting in a representative character when he prosecutes a violator of the enactment? The Court in Ex parte Young was not confused about these questions; it knew the answers. It was deliberately indulging in fiction in order to find a way around sovereign immunity.

3 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 27.03, at 553 (1958). A few years later Professor Davis reiterated the point in an article. Kenneth Culp Davis, *Suing the Government by Falsely Pretending to Sue an Officer*, 29 U. CHI. L. REV. 435, 437 (1962). The fiction theory became hornbook law in 1963 when Professor Wright adopted it, citing and quoting Davis. "There is no doubt that the reality is as Justice Harlan stated it [in *Young*], and that everyone knew that the Court was engaging in fiction when it regarded the suit as one against an individual named Young rather than against the state of Minnesota." CHARLES ALAN WRIGHT, HANDBOOK OF THE LAW OF FEDERAL COURTS § 48, at 159 (1963). The same language appears in the current, sixth edition.

The first three court of appeals cases that characterize *Young* as resting on a fiction all cite Davis. Bd. of Trs. of Ark. A & M Coll. v. Davis, 396 F.2d 730, 732-33 (8th Cir. 1968); La. State Bd. of Educ. v. Baker, 339 F.2d 911, 914 (5th Cir. 1964); Kennedy v. Rabinowitz, 318 F.2d 181, 182 (D.C. Cir. 1963). The first case in which the Supreme Court said that *Young* rests on a fiction was *Pennhurst*, 465 U.S. at 105. Justice Powell referred in passing to the "fiction" of *Ex parte Young* in his concurring opinion in *Monell v. Department of Social Services*, 436 U.S. 658, 712 (1978) (Powell, J., concurring).

95. U.S. CONST. amend. XIV.

*STANFORD LAW REVIEW* [Vol. 60:989

wrongdoer, however, is necessary in order to avoid sovereign immunity. Thus, paradoxically, the Court was treating Young as a private actor for purposes of sovereign immunity and the Eleventh Amendment while treating him as a state actor for purposes of the Fourteenth Amendment.[96]

Justice Peckham is also thought today to have missed an important technical point about federal jurisdiction. The railroads sued Young in the federal circuit court under the federal question jurisdiction. By 1908 the Court had adopted the well-pleaded complaint rule, which allows federal question jurisdiction in the lower courts only when a federal question appears in the complaint in its well-pleaded form. Federal defenses and other federal issues that arise in litigation after the complaint do not satisfy the well-pleaded complaint rule. Ordinary private torts, such as the trespass alleged in *Osborn*, do not violate federal law. In an officer suit like *Osborn*, the federal question would not arise until a third stage of pleading, in response to the defendant's claim of official privilege. If the railroads too were claiming a trespass, their initial complaint raised no question of federal law. As in *Osborn*, the validity of the state statute would not come into the case until later, which is too late according to the well-pleaded complaint rule.[97]

A simple solution to these problems, suggested by some commentators, is just to say that the private-wrong story is a story. In reality the State is the

---

96. According to Wright, "The fiction has its own illogic. The Fourteenth Amendment runs only to the states; in order to have a right to relief under the amendment the plaintiff must be able to show that state action is involved in the denial of his rights." WRIGHT, *supra* note 94, § 48, at 159.

In *Aldens, Inc. v. Packel*, 524 F.2d 38 (3d Cir. 1975), the court of appeals confronted a tricky problem when Packel, Attorney General of Pennsylvania and defendant in an officer suit, sought to bring a counter-claim on behalf of the State. If the defendant was the Attorney General himself and not the State, how could a non-party assert its claim against the plaintiff? The Third Circuit formulated the question as a choice between the Eleventh Amendment fiction, according to which Packel was the defendant and Pennsylvania was not, and the Fourteenth Amendment fiction, which was the other way around. For purposes of Rule 13 of the Federal Rules of Civil Procedure, it adopted the Fourteenth Amendment side of the paradox. *Id.* at 50-51.

97. David Currie explained the connections among the fiction, the paradox, and the well-pleaded complaint rule. As *Perkins* did not involve diverse parties, it had to come into federal court under the federal question jurisdiction. "To modern eyes this theory seems obviously correct, since the complaint alleged that the defendant threatened to deprive the plaintiff of property without due process of law. In explaining why the suit was not one against the state, however, the court enunciated a thesis wholly inconsistent with this approach." CURRIE, *supra* note 60, at 53. Currie then quoted the passage from *Young* explaining that Young was stripped of his official capacity. He continues:

> If the officer was "stripped of his official . . . character," he could not violate the due process clause, which applies only to state action. Peckham did not attempt to justify this contradiction. The alternative argument that the fourteenth amendment was relevant only to defeat the defense of official authority would have been insufficient to sustain federal jurisdiction under the rule of *Louisville & Nashville Railway v. Motley*, which held that the federal nature of the case must appear from the plaintiff's statement of his own claim.

*Id.* (footnotes omitted).

defendant, and sovereign immunity is limited for reasons of policy.[98] The conduct of the State really is governed by the Fourteenth Amendment, so a federal question appears in the well-pleaded complaint, and there is no paradox. The only pleading problem is falsely pretending to sue the officer when the defendant is the State.

Another, more subtle account retains a suit against Young himself, and not Minnesota, while recognizing a novel and unusual kind of federal along with a cause of action to enforce it. This approach assumes that the Constitution goes beyond nullification and in addition forbids some conduct by officials that is not, in a sense, official conduct, because it rests on an invalid rule. In addition to limits on power that result in nullification, the Constitution subjects government officers to tort-like rules of individual conduct that result in individual liability, rules that apply not to physical actions like Osborn's but to purported exercises of the legal power of government like Young's. According to this analysis Young was violating this type of rule, was an individual (albeit not really a private) wrongdoer, and could be enjoined. This way of thinking avoids the paradox by providing an explanation of how someone could be subject to a rule derived from the Constitution that applies to States without being the State for purposes of sovereign immunity. Because the Constitution provided the tort-like rule that applied to Young, it properly figured in the railroads' bill in equity, which thus satisfied the well-pleaded complaint rule.[99]

---

98. That appears to have been Professor Davis' view. After rhetorically asking whether a state officer enforcing an unconstitutional statute is still an officer, he wrote:

> The Court in Ex parte Young was not confused about these questions; it knew the answers. It was deliberately indulging in fiction in order to find a way around sovereign immunity. It knew that the injunction against the attorney general was in truth a means of preventing the state from enforcing the statute. The reality is all too obvious that the suit was in practical effect against the state.

3 DAVIS, *supra* note 94, § 27.03, at 553.

> Courts too sometimes take the view that *Young* allowed a suit against the State for policy reasons, and called it one against the officer for unstated reasons. In *Neal v. Georgia*, 469 F.2d 446 (5th Cir. 1972), a case involving the handling of prison inmates' mail, the court dismissed Georgia as a defendant but approved relief against officers, relying on *Young*. "This may be a fiction, but like a lot of other legal fictions it is useful." *Id.* at 448. "[I]t is a fiction necessary for the preservation of federal constitutional rights." *Id.*

99. This understanding of *Young* is intimated through questions in the first edition of the Hart and Wechsler casebook. In a note on that case, the editors ask:

> What was the source of the "general law" . . . under which the defendants in Young and [Georgia Railroad & Banking Co. v. Redwine, 342 U.S. 299 (1952)] were judged to have been guilty of "wrongful individual action"?
>
> Was it state law or federal? If federal, was it a body of law simply reflecting generally accepted principles of liability of the traditional common law? Or a body of unwritten federal law which the Supreme Court is newly developing in the light of the felt exigencies of effective constitutional administration?

HENRY M. HART, JR. & HERBERT WECHSLER, THE FEDERAL COURTS AND THE FEDERAL SYSTEM 818 (1953). Although Hart and Wechsler mean to imply the latter, if I am right the former is the correct answer. The passage continues by alluding to the well-pleaded complaint rule: "In Young, Redwine, and many other similar cases, diversity of citizenship was lacking. This makes it plain, does it not, that the operative law creating the cause of

Both attempted solutions find in the Fourteenth Amendment, and not the ordinary non-constitutional law, a rule of duty and a cause of action to enforce it. Both resolve the paradox. But *Ex parte Young* does not entail a novel cause of action under the Constitution, nor does it produce a paradox that must be avoided, because it involved an anti-suit injunction.

Anti-suit injunctions did not have to be invented in 1908, but were a familiar equitable remedy, just like injunctions against torts were when *Osborn* was decided. The railroads had to make the same showing with respect to Young that they would have had to make with respect to another railroad that was planning an action at law. They had to show an impending lawsuit, a substantively good defense, and a reason that presenting the defense at law was not an adequate remedy. The defense itself came from the Constitution, which nullified the Minnesota rates, but nothing else in the railroads' bill in equity did. Their cause of action, in the sense of their entitlement to affirmative relief, came from standard principles of equity.[100] It was thus neither novel nor rooted in the Constitution. At the time of *Young* it was probably not even federal, though in light of *Erie*[101] and *Guaranty Trust*[102] it likely would be so characterized today.[103]

---

action was federal?" *Id.* Again, my view is that it is not plain, nor even true, that the well-pleaded complaint rule implies a federal cause of action in the anti-suit context, but Hart and Wechsler meant the contrary. They continued:

> Is it not plain also that in Ex parte Young the Court abandoned the use of general principles of common law liability as the measure of the content of this judicially created federal equitable cause of action? Should not the Redwine opinion in candor have acknowledged this and stated frankly that Ex parte Young had undermined the basis of In re Ayers?"

*Id.*

Hart and Wechsler indicated that *Young* recognized or created a new federal cause of action found in the Constitution. As Young was the defendant, the implication is that the Constitution, which regulates States, imposes duties on officers with respect to their official conduct, duties enforced through the *Young* cause of action. The Court in *Young* concluded that the Attorney General's conduct was not in fact authorized, so the constitutional rule under which he was sued must have applied to purported official acts that were nevertheless in excess of authority.

100. Equity often provides additional remedies where the law already provides an entitlement to affirmative relief, a cause of action. Anti-suit injunctions, by providing affirmative relief on the basis of legal advantages that otherwise would be asserted as defenses, are not just an equitable remedy but an equitable cause of action. In that sense the principles that create them are like the Declaratory Judgment Act, 28 U.S.C. § 2201 (2000), which goes beyond providing a new remedy and authorizes parties who otherwise would be only defendants to become plaintiffs.

101. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

102. Guar. Trust Co. v. York, 326 U.S. 99 (1945).

103. When *Young* was decided the federal courts administered their own version of equity jurisprudence. It is very unlikely that judges regarded those equitable remedies and principles as federal law for purposes of Articles III and VI of the Constitution. Rather, equity was part of the general law, like the general commercial law relied on in *Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842). It was not the law of any one state, but neither did it support Article III jurisdiction or override state law through the Supremacy Clause. The best account of the old system is William A. Fletcher, *The General Common Law and Section 34*

No paradox arises, because the equitable principles underlying anti-suit injunctions apply generally, and not just to people who claim to act for the government. Equitable protection against lawsuits does not come from a rule that begins "No State shall." The Constitution in *Perkins* performed its normal function of nullifying state laws that violate it, just as it would have nullified a claim by a customer of the railroads trying to collect for having been overcharged as measured by the statutory rate. *Ex parte Young* did not have to interpret the Constitution as creating a cause of action available only against state actors, because it did not have to interpret the Constitution itself as creating a cause of action.

Nor did the railroads have to engage in fiction by denying that Young's reason for bringing the lawsuit was his role as Attorney General of Minnesota and his duty under the law as he understood it. As they would have done in an enforcement proceeding, the railroads were denying that the statute being enforced was valid, not that the officer seeking to enforce it was indeed an officer. The railroads did need to allege, and Young appears to have conceded, that if the statute was indeed unconstitutional it could not provide him with official privilege, just as the tax on the Bank could not provide Osborn with official privilege. To say that for certain purposes an official is treated as a private person would be treated is not to say that an official is a private person.

Although the railroads' cause of action did not come from the Constitution, a constitutional issue did belong in their complaint, which therefore satisfied the well-pleaded complaint rule. In order to qualify for anti-suit relief, plaintiffs, then and now, must allege that they have a valid defense at law but that the remedy of presenting it as such is inadequate. In order to show that, the railroads of course had to set out their constitutional objections to the Minnesota rates. Equity pleading rules thus required that an issue that would be a defense at law appear in the complaint in equity.

At the time of *Young* the Court applied the well-pleaded complaint rule to equity cases in a straightforward fashion. It asked whether the issue that would support federal jurisdiction properly appeared in the bill in equity, without asking how it would appear in a related action at law. The Court respected the niceties of pleading, and in particular the varying demands of law and equity. In *Taylor v. Anderson,*[104] the plaintiff in an ejectment action sought to raise a federal-law defect in the defendant's claim to occupy the property. That did not satisfy the well-pleaded complaint rule, the Court explained, because the inadequacy of the defendant's title is not properly pled at the outset in ejectment, an action at law. The Court noted that it might be appropriate to

---

*of the Judiciary Act of 1789: The Example of Marine Insurance,* 97 HARV. L. REV. 1513 (1984). Today the Court very likely would regard an equitable remedy that protected a legal advantage derived from federal law as itself federal law. In that sense the *Young* anti-suit remedy is now a cause of action under federal law, but still not under the Constitution.

104. 234 U.S. 74 (1914).

*STANFORD LAW REVIEW*                [Vol. 60:989]

raise that issue in a bill in equity to cancel the defendant's deed, but the pleading rules for ejectment were different.

The Court distinguished *Taylor* a few years later in *Lancaster v. Kathleen Oil Co.*,[105] which applied the well-pleaded complaint rule to a bill to recover possession and enjoin the defendant, who claimed under a lease, from any further interference with the plaintiff's rights under its own lease. The validity of both leases depended on federal law, and the Court found that the plaintiff's claim for an injunction rested on the soundness of its own lease and the infirmity of the defendant's. Those issues would not have been raised in the complaint in a legal action for ejectment, but plaintiffs had not brought such an action; indeed, their claim in equity rested in part on the unavailability of ejectment and hence the inadequacy of any remedy at law. As a result, their well-pleaded complaint included a federal question, and jurisdiction in the lower federal courts was appropriate.

In similar fashion, the Court in 1917 in *Hopkins v. Walker* held that a bill to remove a cloud on title satisfied the well-pleaded complaint rule when federal law determined the validity of both the plaintiff's claim and the defendant's claim that constituted the cloud.[106] "[T]he facts showing the plaintiff's title and the existence and invalidity of the instrument or record sought to be eliminated as a cloud upon the title are essential parts of the plaintiff's cause of action," and so federal question jurisdiction was proper in the lower federal court.[107]

In *Hopkins*, the Court explained that a bill to remove a particular cloud on title is like one to cancel a deed, lease, or mortgage that would impair the equity plaintiff's claim. A bill to cancel a deed in effect anticipates an action claiming under the deed, an action that would be brought by the equity defendant. Suing for cancellation enables the equity plaintiff to raise the defense that the deed is invalid. It is a means of turning a defendant at law into a plaintiff in equity, and the Court understood the equity proceeding to satisfy the well-pleaded complaint rule, even though the equity plaintiff's federally based argument would arise as a defense at law. There was no *Skelly Oil*[108] principle for injunctive suits that anticipated actions at law and reversed the parties to them: the pleading to which the well-pleaded complaint rule applied was the bill in equity, not the complaint in the corresponding action at law. Nor was there a new cause of action in *Perkins*, real or fictional.[109]

---

105. 241 U.S. 551, 555 (1916).

106. Hopkins v. Walker, 244 U.S. 486 (1917).

107. *Id.* at 490.

108. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950) (noting that well-pleaded complaint rule in federal declaratory judgment actions is applied by evaluating complaint in corresponding non-declaratory action).

109. It may seem that *Young* involved a change in equitable principles governing joinder of parties, even if it did not change sovereign immunity doctrine or recognize a new cause of action. In earlier cases in which plaintiffs sued officers in an attempt to obtain

B. *The Cause of Action in the Court's Opinion*

The anti-suit rationale justifies the result in *Young* without invoking any private tort threatened by the Attorney General of Minnesota. Whether Justice Peckham's opinion implies that there was such a tort is a more difficult question. Justice Peckham introduced his discussion of the earlier cases that had upheld injunctions against enforcement of rates, *Reagan v. Farmers' Loan & Trust Co.*[110] and *Smyth v. Ames*,[111] this way: "Whether the commencement of a suit could ever be regarded as an actionable injury to another, equivalent in some cases to a trespass such as is set forth in some of the foregoing cases, has received attention in the rate cases, so called."[112] Equivalence is not identity. Maybe Peckham meant by "actionable injury to another" a private wrong giving rise to an action at law, but he did not exactly put it that way, and in the preceding paragraph he had noted that the Court's actual trespass cases, including *Osborn* and *United States v. Lee*,[113] "do not include one exactly like this under discussion."[114] Perhaps Peckham meant to identify a new kind of trespass, or maybe he meant to say that what Attorney General Young threatened to do was like a trespass and equivalent to one for purposes of injunctive relief and sovereign immunity. As he was talking about injunctive relief and sovereign immunity, not damages against Young personally, the latter is certainly plausible. In discussing *Reagan* and *Smyth* Peckham then said

affirmative relief from States, the Court often expressed its conclusion in terms of proper parties. One response to such suits was to say that the officer was merely a nominal party but that the suit was really against the State, the real party in interest, and so could not proceed. *See, e.g.*, Christian v. Atl. & N.C. R.R. Co., 133 U.S. 233, 245 (1890) (noting that in an officer suit to obtain corporate dividends payable to the State, the State is the "only party really concerned" and the suit is "virtually against her"). Another response was to say that the suit could not go forward because the State, an indispensable party, had not been sued. *See, e.g., id.* at 246 (holding that the State, to whom dividends are owed, is "an indispensable party to any proceeding in equity in which its property is sought to be taken and subjected to the payment of its obligations").

On the question of joinder *Young* did not innovate, but followed *Osborn*, which in one part of the opinion analyzed the question as one of joinder. *Osborn* did not assert any personal claim to the Bank's property, as Young asserted no personal cause of action against the railroads. But Osborn was a proper defendant because relief could be afforded through a decree against him. Osborn v. Bank of the U.S., 22 U.S. (9 Wheat.) 738, 843 (1824). Young was not the real party in interest, but would be subject to the decree and if he violated it would be, and in fact was, personally sanctioned. He was a proper party like Osborn. Ohio was not an indispensable party in *Osborn* because the decree against its officer, although it would in practice interfere with the State's claim on the property at issue, did not actually adjudicate that claim and bind the State. *Id.* at 850-51. Assuming that the injunction against Young did not bind Minnesota legally, the fact that the decree had an adverse practical effect on the State was not enough to make it an indispensable party.

   110. 154 U.S. 362 (1894).
   111. 169 U.S. 466 (1898).
   112. *Ex parte* Young, 209 U.S. 123, 153 (1908).
   113. 106 U.S. 196 (1882).
   114. *Young*, 209 U.S. at 152.

*STANFORD LAW REVIEW* [Vol. 60:989

that neither was in effect a suit against the state for purposes of sovereign immunity, but he did not say that either one involved a private tort.[115]

A similar ambiguity enters into the frequently quoted passage that calls Young's act "illegal": "It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional."[116] That may seem necessarily to imply that it was a tort-like wrong. But the rest of the sentence is about invalidity. As for the word "illegal," Justice Peckham elsewhere in *Young* used it to mean something like "contrary to law." He said that the injunction against the Attorney General in *Ayers* "was declared illegal."[117] Unless he meant that the lower court should have been liable in damages, "illegal" meant "legally improper," a more general concept that includes invalidity.[118] By "illegal" in the sentence about Young, Peckham likely meant void.

While the opinion in *Young* does not actually commit the Court to the proposition that Young was threatening a private wrong when threatening to bring suit on behalf of the State, one could certainly get that impression. Such is the power of *Osborn* that later opinions fairly soon came to read *Young* in that way, at least with respect to the expressions they used. As noted above, they did not actually treat threatened litigation as threatened wrongdoing. They continued to regard the remedy at law in a *Young*-type case as the defense in an enforcement proceeding, not as a free-standing damages action against the officer. In that crucial respect *Young* was quite different from *Osborn*, the day it was decided and for decades later.

## CONCLUSION

Leading cases are intrinsically interesting, so it is worthwhile to understand them better. Leading cases also sometimes come to be just the names of doctrines that are well established in their own right and no longer rest simply on the precedential force of the first authority in the citation list. When that happens, a changed understanding of the founding case, even an eponymous case, may not actually matter to working doctrine. The revised account presented here, however, does have some significance for current issues related to sovereign immunity and constitutional causes of action.

---

115. *Id.* at 153-54.

116. *Id.* at 159.

117. *Id.* at 152.

118. One commentator around the time of *Young*, annoyed by the tendency to use terminology appropriate to duty when talking about power, railed on the use of "illegal" to mean "ultra vires" when applying the corporate-law doctrine of that name. "One of the common forms of confusion in the use of the term arises from the failure of the courts to discriminate between the words 'illegal' and 'ultra vires.'" 3 SEYMOUR D. THOMPSON, COMMENTARIES ON THE LAW OF PRIVATE CORPORATIONS § 2767 (Joseph W. Thompson ed., 2d ed. 1909).

*Ex parte Young* is today characterized as a basic decision about sovereign immunity.[119] If the understanding of the case presented here is correct, the question arises whether the principles derived from it need to be reconsidered. Without seeking to resolve any particular doctrinal dispute, I will suggest that an improved understanding of *Young* does matter for current problems, because that case was a watershed for good reason. Attorney General Young had a plan to avoid judicial review by making the traditional way of obtaining it too costly: had they violated, litigated, and lost, the railroads would have paid a heavy price, a price that could keep them from ever violating the rates. The Court in *Young* found that arrangement per se unconstitutional, because of its interference with judicial relief, but still had to find a way for the railroads to raise their claim without running that risk. By approving the anticipatory proceeding brought by a person subject to a statute, the Court substantially changed the law of constitutional remedies.

It did so, I have argued, without doing any violence to principles of sovereign immunity, precisely because the remedy it created was designed for potential defendants. Accepting the anticipatory remedy therefore does not imply accepting all equitable relief, or all prospective relief, or all relief that requires that government officers conform their conduct to the law.[120] *Young* does not, for example, require that officer suits be available to require specific performance of a State's contract. Specific performance is equitable and prospective, and is used to require conduct in conformity with the law, including sometimes the Contracts Clause of the Constitution. Unlike an anti-suit injunction it is also affirmative and not negative as those ideas are used in sovereign immunity doctrine, and the Court treats it as impermissible.

Anti-suit injunctions to protect potential defendants are consistent with sovereign immunity, and their availability therefore does not imply any exception to that principle. This is important because the anticipatory remedy against enforcement is well-established, and is so for the reasons that moved the Court in *Young*: sometimes it is the only practicable means by which a constitutional defense can be brought before a court. If the *Young* anti-suit injunction is treated as a fixed point, and if it is an exception to sovereign immunity, then principled decision making requires that other exceptions that flow from its rationale also be recognized. But while the case may be a fixed

---

119. *E.g.*, Edelman v. Jordan, 415 U.S. 651, 664 (1974) ("*Ex parte Young* was a watershed case.").

120. One current formulation of the principle of *Young* that is too broad according to the anti-suit interpretation of the case appears in Justice Souter's dissent in *Idaho v. Coeur d'Alene Tribe*.

> When Congress has not so displaced the *Young* doctrine, a federal court has jurisdiction in an individual's action against state officers so long as two conditions are met. The plaintiff must allege that the officers are acting in violation of federal law . . . and must seek prospective relief to address an ongoing violation, not compensation or other retrospective relief for violations past.

521 U.S. 261, 298-99 (1997) (citation and footnote omitted).

point, it did not relax sovereign immunity. Arguments to do so thus cannot rest on the need to have anticipatory litigation of constitutional defenses.

Reconceiving *Young* as involving an anti-suit injunction also has implications for contemporary thinking about causes of action founded in the Constitution itself. Whether the Constitution of its own force entitles anyone to a judicial remedy is a question of practical and theoretical interest. As a practical matter, constitutional causes of action enhance federal judicial authority relative to state and legislative authority. Both federalism and separation of powers were at stake in *Bivens*,[121] the Supreme Court's most thorough consideration of this issue. Bivens sought damages from agents of the Federal Bureau of Narcotics who, he alleged, unlawfully broke into his home and arrested him. Had the Court not found that the Fourth Amendment itself gave Bivens a right to recover, his action would have been governed by the law of New York, where the events took place, or by federal legislation governing the liability of federal officers. The Court in *Bivens* found that serious difficulties would arise were state law the measure of liability for federal officers.[122] It regarded the question of constitutional causes of action as in part a question of the allocation of authority in the federal system. Later cases concerning the scope of *Bivens* have involved separation of powers. The question in *Bush v. Lucas*[123] was the adequacy of federal statutory remedies for the vindication of constitutional protections.

Behind the practical considerations about the substance of legal norms and the identities of the institutions that make and interpret them are deep issues concerning the analytical jurisprudence of the Constitution. The document's most familiar function is to grant and limit the powers of government. Rules of that kind have their own peculiar remedial apparatus, and it is not the familiar apparatus of damages and injunctions. Rather, a violation of a rule about power results in invalidity and nothing more. If Congress passes a statute in excess of its enumerated powers, the purported statute is a legal nullity for that reason.

Another kind of legal rule gives rise to another kind of remedy. Rules that govern conduct, such as those that forbid trespass or require that people perform their contracts, are enforced with damages awards, injunctions forbidding or mandating the actions proscribed or required by the substantive law, and similar remedies. Those remedies go beyond determinations of validity and invalidity. Whether the Constitution itself contains the kind of rule that governs conduct, and so may give rise to damages and similar relief, is thus a basic question about the legal categories through which the Constitution operates.

---

121. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

122. *Id.* at 392-95.

123. 462 U.S. 367 (1983).

Understanding that *Young* itself does not imply constitutional duties, claim-rights, or causes of action has implications for doctrine, because the existence and extent of constitutional causes of action (and the duties they vindicate) is a recurring question. One response is to reject them root and branch, on the grounds that the Constitution simply does not contain that kind of rule. If that possibility is, or comes to be, an option for the Court, then it may matter that one particular baby, the anticipatory proceeding to present a constitutional defense, need not be thrown out with the bathwater.

While that development may be unlikely, the Court does from time to time face the question whether to find constitutional causes of action, or extend those it has identified. Most recently it had to consider the scope of the cause of action under the Establishment Clause in light of its current doctrine of Article III standing.[124] When it does, one important question is whether there is any limiting principle: if one constitutional limitation entitles people to affirmative judicial relief on its own, why do not they all? Most of the constitutional causes of action that the Court has recognized so far can be subjected to a limiting principle, because there is something about the provisions' content that specially suggests a judicially enforceable duty. The Fourth and Eighth Amendments, which after *Bivens* give rise to damages actions, are among the Constitution's closest analogs to the law of tort.[125] They protect quite directly the basic rights of person and property that the private law protects. If the tort-like rules that they impose on government officers differ from the rules the ordinary private law imposes on private people, then it is certainly plausible to say that they must have their own tort-like remedy because they have their own tort-like content.[126] Other provisions less resemble the private law in content and so make a weaker case for affirmative judicial enforcement.

Much the same is true with respect to the Takings Clause, which the Court today asserts creates a cause of action against governments for damages.[127] Just as the Fourth and Eighth Amendments are the Constitution's law of tort, so the Takings Clause is its law of property, protecting interests of that character from state interference that is unconstitutional precisely insofar as it resembles a physical invasion or seizure.

Quite different is the cause of action the Court, now somewhat half-heartedly, attributes to the Establishment Clause.[128] It forbids, and the cause of

124. Hein v. Freedom from Religion Found., 127 S. Ct. 2553 (2007).

125. *Bivens* itself recognized a cause of action under the Fourth Amendment. *Carlson v. Green*, 446 U.S. 14 (1980), did so with respect to prison conditions under the Eighth Amendment's ban on cruel and unusual punishment.

126. The substantive differences between the ordinary-law tort and the Fourth Amendment as the Court had interpreted it was one ground for the decision in *Bivens*. 403 U.S. at 392-94.

127. First English Evangelical Lutheran Church v. County of L.A., 482 U.S. 304 (1987).

128. *See* Flast v. Cohen, 392 U.S. 83 (1968). *Flast* was limited, or at least not extended, in *Valley Forge Christian College v. Americans United for Separation of Church*

*STANFORD LAW REVIEW* [Vol. 60:989]

action under it remedies, nothing like a private wrong. But when it recognized the remedy of injunction against spending, the Court in *Flast* was at pains to tie it to the substance of the Clause, which it found to be specifically about taking taxpayers' money and spending it on religion. That argument too does not travel well.

But the anticipatory action recognized in *Young* can be used to present a defense based on any constitutional provision that provides one. That means that it can be used to enforce nearly all the parts of the Constitution that limit government power, which is to say, nearly all of the Constitution. If *Ex parte Young* means, and the availability of the now-familiar anticipatory proceeding implies, that virtually every clause in the Constitution gives rise to a cause of action, then no limiting principle will be available. If *Young* does not mean that, and the remedy it approved does not require that, then it is much easier to think that constitutional causes of action are the exception and not the rule, because they arise only when the content of a provision specially implies one.

The railroads' anti-suit injunction rested on ordinary principles of equity. Those principles make possible the offensive assertion of defenses, and so the offensive vindication of legal norms that do not, of themselves, create causes of action. Constitutional limitations on government power have that form. They do not impose duties, do not create correlative claims, and so do not entitle their beneficiaries to affirmative relief. They do, however, routinely create other legal advantages, including defenses.[129] Understanding *Ex parte Young* as an endorsement of anti-suit injunctions against government officers makes it possible to have that anticipatory remedy without transforming the vast bulk of constitutional limitations from rules about power into rules about the duties of officers. Some exceptional provisions may have the latter form, but they will be the exception and not the rule.

*Ex parte Young* itself is not an exception to sovereign immunity. The belief that it is one numbers among the legends that have grown up about the case, legends I have sought to identify as such. A hundred years is far too short a time for history to turn into legend, or fiction.

---

& *State, Inc.*, 454 U.S. 464 (1982), and again in *Hein v. Freedom from Religion Foundation*, 127 S. Ct. 2553 (2007).

129. A constitutional restriction on power that nullifies some exercises of power is not limited to creating defenses. It can, as does the Contracts Clause in some instances, reinstate a cause of action that would exist but for the law that the Constitution nullifies. That is what happens when the Contracts Clause overrides debtor relief legislation. It enables creditors to assert claims that the debtor relief legislation purported to eliminate, but does not itself create those claims. In *Bronson v. Kinzie*, 42 U.S. (1 How.) 311 (1843), for example, Bronson sued to foreclose on a mortgage, Kinzie defended on the basis of an Illinois statute that expanded mortgage debtors' rights to redeem their property, and Bronson replied that the Illinois statute was invalid under the Contracts Clause, so that his right to foreclose was not impaired by it.

Attachment A

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC | 423-2023-01219 |

and EEOC

*State or local Agency, if any*

| I Name (indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.) | Home Phone | Year of Birth |
|---|---|---|
| Mrs. JOANN D. WALKER | 662-571-9124 | |

**Street Address**

503 East Jefferson Street

YAZOO CITY, MS 39194

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| MS DEPARTMENT OF CORRECTIONS (Hinds Probation & Parole) | 15 - 100 Employees | |

**Street Address**

421 W. PASCAGOULA ST.

JAX, MS 39203

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Age, Disability | 01/10/2023 | 04/15/2023 |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by the above-referenced employer as a Correctional Service Aid I sometime in 1995. In 2006, I got promoted to Correctional Case Manager. After leaving in 2007, I got rehired in November 2009 as a Correctional Service Aid II. In November 2016, I got promoted to the position of Parole Specialist II (previously called Special Project Officer II).

I have been aware of my disability since February 2019, when I got diagnosed. I informed the respondent soon after. My disability has not affected my ability to perform my job duties successfully. Despite that, I believe I was not selected for promotion because of my disability. On January 10, 2023, I applied for the Program Specialist position. I applied for the openings in Hinds County and Madison County. On February 28, 2023, I tried inquiring about the status of my application. I was told the personnel department would notify me when the position was filled. Although the Madison County opening has not been filled, in April 2023, Priscilla Johnson (late 20s old), was selected for the position. I was not formally notified until June 9, 2023. Johnson was previously employed for the respondent as a Correctional Service Aid for about 18 months. Beyond all the additional

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the above is true and correct. | SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Mrs. JOANN D. WALKER** | |
| 08/08/2023 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| *Charging Party Signature* | |



1 of 3



EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC | 423-2023-01219 |
| | | and EEOC |

*State or local Agency, if any*

extensive experience I had compared to Johnson, I had performed the duties of her previous position for approximately 11 years. Despite having significantly more relevant experience and seniority, I was not selected, as the respondent selected a lesser-qualified candidate outside my protected class (56 y/old). In addition to that, I have a good performance record and have had no disciplinary or attendance issues during my time working for the respondent, which is not the case for Johnson as, at the least, she has had attendance issues.

I believe I was discriminated against on the basis of my age (56) and disability, in violation of the Age Discrimination in Employment Act of 1967, as amended, and the Americans with Disabilities Act (ADA), as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Digitally Signed By: Mrs. JOANN D. WALKER 08/08/2023 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| *Charging Party Signature* | |

2 of 3

3

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

3 of 3

Attachment: B

# Tab A:

# Field Office

# Product

# Documents

1 of 5

## Pre-Determination Interview

| Charge No. | 423-2023-01219 | | Investigator: | Shamla S. Moore |
|---|---|---|---|---|
| Contact with: | X | Charging Party | Respondent | |
| Name/Title of Person Contacted: | | JoAnn Walker; Charging Party | | |
| Contact Made: | X | Telephone: | 662-571-9124 | |

**1. SUMMARY OF INTERVIEW:**

I conducted a PDI with CP. (b)(7) 9 lines ███████████████████████ I explained to CP that it is recommended that he receive a notice of right to sue, and he will have 90 days to pursue the matter in federal court.

**RECORD OF RESPONSE:**

CP stated, "I understand and will wait on my right to sue letter; so, thank you, Ms. Moore."

**2. Informed the party (CP) of private suit rights under:**

| | Title VII | | ADEA | X | EPA | | ADA | X | |
|---|---|---|---|---|---|---|---|---|---|
| 5. Explained, if a not cause, the DISMISSAL AND NOTICE OF RIGHTS will explain private suit rights. | | | | | | NO YES | YES | | |

2 of 5

| Signature of Investigator: | Date: March 5, 2024 |
| --- | --- |

3 of 5

EEOC Form 291 (11/09)

## MEMORANDUM

## RECOMMENDATION FOR CLOSURE

TO: Eszean McDuffey, Director

CHARGE NO. _____ 423-2023-01219 _____

FROM: Shamla Moore, Federal Investigator

SUBJECT: _____ Joann Walker _____

*Charging Party*

v.

MS Depart of Corrections (Hinds Probation & Parole)

*Respondent*

I recommend dismissal/closure of the subject charge based on the following:



Specific information in support of recommendation/decision:

On August 8, 2023, CP filed a charge alleging she was discriminated against due to her disability in violation of the Americans with Disabilities Act, as amended, ADA and also, in violation of the Age Discrimination in Employment Act of 1967, as amended in that she was denied a promotion due to her disability (neurological-other-neurological) and age (56). Promotion: In order to establish a violation on a Promotion issue, the evidence must show in the following order of proof: 1) Charging Party belongs to a protected group; 2) Respondent had a vacant position; 3) Charging Party applied for or expressed an interest in the position; 4) Charging Party was qualified for the position; and 5) Charging Party was not selected but a lesser qualified person not of Charging Party's group was selected. Although CP is a member of the protected group; R had a vacant position; in January 2023 and CP did apply for positions in Madison and Hinds. CP alleges she was denied a promotion on or about April 2023 for a Program Specialist II. CP stated the Madison position was not filled.

CP stated, the interview board members were over the age of 40. CP stated, she has a disability (neurological-other-neurological) and she had a non-work related knee injury, but the Respondent accommodated her with the promotion to Parole Specialist because of it. CP stated, she didn't give R a letter about any restrictions for a disability (carpal tunnel).

4 of 5

Decision by/
  Recommendation approved by: _____

                                          *(Signature)*                                    *(Date)*

5 of 5

Attachment: D

# Tab C:

# Charing Party

# Documents

1 of 4

**EEOC (Inquiry) Number: 423-2023-01219**

# INQUIRY INFORMATION

## INQUIRY OFFICE

**Receiving:** Jackson Area Office
**Accountable:** Jackson Area Office

## POTENTIAL CHARGING PARTY

**Name:** Mrs. JOANN D. WALKER
**Address:** 503 East Jefferson Street
YAZOO CITY, MS 39194
**Year of Birth:**
**Email Address:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Phone Number:** 662-571-9124

## POTENTIAL CHARGING PARTY'S DEMOGRAPHICS

**Gender:** Female
**Disabled?** No
**Are you Hispanic or Latino?** No
**Ethnicity:**
**National Origin:**

## RESPONDENT/Employer

**Organization Name:** MS DEPARTMENT OF CORRECTIONS (HINDS PROBATION & PAROLE)
**Type of Employer:** State or Local Government that I applied to, work for, or worked for
**Number of Employees:** 20 or more employees
**Address:** 421 W PASCAGOULA ST
JACKSON, MS 39203
**County:** HINDS
**Phone Number:**

## LOCATION OF POTENTIAL CHARGING PARTY'S EMPLOYMENT

**Address:**
**County:**

## RESPONDENT CONTACT

**Name:** BRYAN ROBERTS
**Email Address:**
**Phone Number:**
**Title:**

## REASON(S) FOR CLAIM

**Date of Incident (Approximate):** 04/15/2023

**Reason for Complaint:** Disability

**Pay Disparity:**

**Location of Incident:** Mississippi

**Submission (initial inquiry) Date:** 06/06/2023

**Claim previously filed as charge with EEOC?** No

**Approximate Date of Filing:**

**Charge Number:** 423-2023-01219

**Claim previously filed as complaint with another Agency?** No

**Agency Name:**

**Approximate Date of Filing:**

**Nature of Complaint:**

**ADVERSE ACTION(s)**

On January 26, 2023 I along with others were interviewed for a position with the Hinds Co. Probation & Parole Office where I work now, but they hired someone that used to work here as a clerk for a year or two.  I have 15 plus years experience but was not hired which I think its due to me having a workers comp case (Carpal Tunnel).  But the position we interviewed for does not require a lot of work.  Around April 15, 2023 this person returned back stating that she was back.  As of today, 6/6/2023 I still have not received anything saying that I didn't get the job, when I asked one of the supervisors on 02/28/2023 she stated that all paperwork has been submitted to our personnel department and they will make notification when paperwork is processed.

**APPOINTMENT**

**Appointment Date and time:** 08/04/2023 10:30:00 CST

**Interview Type:** InOfficeByVideo

**APPROXIMATE DEADLINE FOR FILING A CHARGE:** 10/12/2023

3 of 4

# **Supplemental Information**

**What Reason(s) were you given for the action taken against you?**

I received an emailed letter from Mrs. Shelly McTeer on June 9, 2023 stating that We sincerely thank you for taking the time to apply and meet with our team about the Program Specialist II position. Unfortunately, we regret to inform you that we've selected another candidate. We received many applications from experienced and qualified applicants, and competition is extremely high. Based on the skills and the experience you have, we hope you'll consider applying for other positions that interest you.

**Was anyone in a similar situation treated the same, better, or worse than you?**

The person hired for the position had a previous poor attendance record, poor work ethic, etc. In which I am always at work and on time, good work ethic, etc.

I am the only one that already works at the office that applied for this position. I only know of one other person that applied for the position (but there were many others), and I was told by other Staff Members that the Supervisor did not want to rehire her, for reasons not told to me.

**Please provide name(s) and email and/or phone number of anyone who will support your claim, and briefly describe the information this person will provide.**

Daniel Horton, DMHorton@mdoc.state.ms.us (no longer with MDOC) phone # ▮▮▮▮▮▮▮▮; Darin Lofton, DLofton@mdoc.state.ms.us ▮▮▮▮▮▮▮▮; Kenneth Fleming, KFleming@mdoc.state.ms.us ▮▮▮▮▮▮▮▮ - ▮▮; Charles Crook, CCrook@mdoc.state.ms.us ▮▮▮▮▮▮▮▮ can all confirm my being on time and work ethics, not for sure if the other person has or had been disciplined for being late. All staff can verify that the person that was rehired was late a-lot, work ethics poor then and now, etc.

**Please tell us any other information about your experience.**

I have worked with MDOC (2nd time around) for almost 14 years. I have never had an write ups or counseling sessions about me been late or poor work ethics. I am always willing to help the Agents and others in what ever I can. I am very professional at whatever I do.

4 of 4

Attachment: E

**CP Joann Walker**

**FU-Interview Notes**

**<u>Charge No. 423-2023-01219</u>**

**March 5, 2024**

**2:35pm**

**Notes by: Investigator Shamla Moore**

When did you start working at the company? **I was rehired in 2009. In 2016, the company accommodated me and put me on light duty in the role of Parole Specialist II and it was called a Special Project Officer II; so, that's how my title changed. It was no money increase because it was a new assignment. However, I agreed to take the job because my office was upstairs and after I had a personal knee injury; they moved me to that position. The new assignment, Parole Specialist II prepared case-loads and went to court and help out the supervisor.**

Can you explain what happened during the time of employment from January 10, 2023 to April 15, 2023? **I applied for the Program Specialist II position in January and interviewed on January 26, 2023 along with other applicants. I had to submit a request for substitution in order to interview and so did a lady name, Priscilla Johnson. I applied because those were some of the duties. We have a new Supervisor and he ask me to do things and I do them because I don't mind. However, Ms. Johnson don't perform all the duties and I think that is unfair. In all my years at the job I received a $1200.00 raise. I don't think Ms. Johnson submitted her request until after January 26, 2023 and that's what made me say she was lesser qualified than me.**

What is your disability? **Carpal tunnel in my hands.**

Did you inform the Respondent about your disability? **Yes, they were aware of it and accommodated me in 2016.**

How would it hinder you form your job? It wouldn't hinder me **and I was accommodated.**

**Did you send R a letter or documentation for limitations or restrictions regarding your disability? No, I did not provide the company with a letter about any restrictions.**

How old are the interview board members that interviewed you and the applicants on January 26, 2023? **It was Shelly Mcteer; James Gibbons and Frederick Holman, but they all are over the age of 40.**

Attachment: F



**STATE OF MISSISSIPPI**
**DEPARTMENT OF CORRECTIONS**
**BURL CAIN**
**COMMISSIONER**

Bryan P. Roberts
Attorney

(601) 359-5273
Office of the Commissioner

**September 28, 2023**

Shamla Moore
EEOC Jackson Local Office
100 West Capitol Street, Suite 338
Jackson, MS 39269

     Re:   *Charging Party Joann Walker; Charge No: 423-2023-01219*

Dear Ms. Moore:

Please consider this letter to be the Mississippi Department of Corrections' (MDOC) position statement concerning the issues covered by the referenced charge. The Respondent has also attached documentation that is responsive to the charge and relevant for your consideration.

The MDOC is responsible for providing secure facilities and effective post-release supervision for offenders and ensuring a safe and professional work environment for all staff members. MDOC is committed to operating with intergrity in the behavior, actions and decisions of our employees. This includes being fair in the treatment of employees, offenders and our dealings with the public.

The Charging Party (CP) alleges:

*I was hired by the above-referenced employer as a Correctional Service Aid I sometime in 1995. In 2006, I got promoted to Correctional Case Manager. After leaving in 2007, I got rehired in November 2009 as a Correctional Service Aid II. In November 2016, I got promoted to the position of Parole Specialist II (previously called Special Project Officer II).*

*I have been aware of my disability since February 2019, when I got diagnosed. I informed the respondent soon after. My disability has not affected my ability to perform my job duties successfully. Despite that, I believe I was not selected for promotion because of my disability. On January 10, 2023, I applied for the Program Specialist position. I applied for the openings in Hinds County and Madison County. On February 28, 2023, I tried inquiring about the status of my application. I was told the personnel department would notify me when the position was filled. Although the Madison County opening has not been filed, in April 2023, Priscilla Johnson (late 20s old), was selected for the position. I was not formally notified until June 9, 2023. Johnson was previously employed for the respondent as a Correctional Service Aid for about 18*

*months. Beyond all the additional extensive experience I had compared to Johnson, I had performed the duties of her previous position for approximately 11 years. Despite having significantly more relevant experience and seniority, I was not selected, as the respondent selected a lesser-qualified candidate outside my protected class (56 y/old). In addition to that, I have a good performance record and have had no disciplinary or attendance issues during my time working for the respondent, which is not the case for Johnson, as, at the least, she has had attendance issues.*

*I believe that I have been discriminated against on the basis of my age (56) and disability, in violation of the Age Discrimination in Employment Act of 1967, as amended, and the Americans with Disabilities Act (ADA), as amended*

## **POSITION STATEMENT**

The Charging Party's allegations that the she was discriminated against because of her age and disability are not accurate since the Respondent's employment decision was based on reasonable factors other than age. The CP was selected, along with other candidates from the applicant pool, to be interviewed for the Program Specialist II Position.

The Respondent posted the position of Program Specialist II on January 4, 2023. (See Attachment A). The application period ran from January 4, 2023 until January 11, 2023. According to the MSPB Handbook, the Program Specialist II position, is a *"second level program management and support professional position accountable for directing and analyzing the processes and activities of the agency program. Employees are responsible for coordinating multiple projects and assignments in support of an agency program or operation, and program planning, evaluation, financial and management analysis, and operational auditing. Responsiblities may include identifying operational problems, making recommendations for improvement, and assisting in implementing solutions. Works under general supervision of a supervisor/manager."* (See Attachment B). Additionally, the Program Specialist II position requires a Bachelor's degree and 1-3 years of experience. (Also See Attachment B)

Intially, the CP did not meet the educational qualifications for the Program Specialist Position because the highest education that the CP had was a high-school dipoloma, when the Program Specialist Position II required a Bachelor's degree. (See Attachment B-1) However, the CP was asked by the Respondent, to interview for the Program Speciliast position once the CP had received a *"Substitution Approval"* from the Mississippi State Personnel Board (MSPB). (See Attachment C). The *"Substitution Approval"* is simply a mechaniscm in which the MSPB will allow the hiring agency to substitute one qualification for another. In this case, the CP requested that her years of experience be substituted for her lack of not having the needed educational qualification.

The Respondent received twelve (12) applicants for the Program Specialist II Position. (See Attachment D). Of those applicants, only eight (8) qualified to be interviewed, including the CP. The eight (8) interviewees submitted to a interview in front of a three (3) person interview panel. The inteviewers on that panel consisted of CCAD Shelly McTeer, PPAS James Gibbons, and LEO III Fredrick Holman. During the interview process, each applicant completes a scored written exercise as well as a scored Q&A session with the interview panel. At the conclusion of the interview process, the scores are tallied from each interviewer and the position is given to the individual with the highest overall score.

2 of 4

Of the eight (8) applicants interviewed, the CP scored fifth overall. (Also See Attachment D). Simply put, there were four (4) interviewees that scored higher than the CP. The position of Program Specialist II was ultimately given to Ms. Priscilla Johnson since she scored the highest of all applicants.

CCAD Shelly McTeer, one of the interviewers on the interview panel, provided a detailed summary of the interview process regarding the Program Specialist II position. (See Attachment E). In her statement, she states, " *On 1/17/2023, I received the applicant referral list and applications for the Program Specialist II Pin #'s 1405 (Madison County) and 1856 (Hinds County) from Rosalynn Martin. On 1/20/2023, I was notified by Ms. Martin that applicants Priscilla Johnson and Joann Walker were approved by SPB to be added to the Referral list for the Program Specialist II position. On 1/23/2023, emails were sent to all applicants for both positions with letters stating that interviews would take place on 1/23/2023 @ Hinds County Probation/Parol Office. On 1/23/2023, interviews were conducted by LEOTL James Gibbons, LEO III/Officer Manager Fredrick Holman and myself, CCAD Shelly McTeer for both PINs in Madison and Hinds County. We interviewed 8 applicants for the Hinds Co Program Specialist II position. Of those, several of them were also on the applicant list for Madison Co Program Specialist II postion. After interviews were completed and scoring of the applicants was conducted, Priscilla Johnson was selected to fill the position of Program Specialist II position for Hinds County. Ms. Johnson scored 87 as did Juwan Bowie who was selected to fill the position of Program Specialist II for Madison Coutny. Both Johnson and Bowie were on the referral list for Madison and Hinds County positions. On 2/1/2023, PTR for Priscilla Johnson was submitted for signature by CCD Hairston and forwarded up to Human Resources. On 3/3/2023, I was notified by Rontonyia Kendrick via email that per SPB Priscilla Johnson lacks required Bachelor's Degree and that she may request substitution of 2 associates degrees for lack of Bachelors Degree. I was informed by Ms. Kendrick that I would have to select the next highest scoring candidate or ask Ms. Johnson to send a substitution letter to SPB to substitute her 2 year Associate Degree and experience in lieu of a Bachelors Degree. I informed Ms. Kendrick that I thought Ms. Johnson had done that already in order to be placed on the register. Ms. Kendrick replied that even though she was on the register doesn't mean she automatically qualifies. At that time, I reached out to Ms. Johnson and informed her to submit a substitution letter to SPB and she informed me she had alreade done so and received the letter from MSPB stating that they reviewed her request for substitution of experience for education and that her request was approved. Ms. Johnson sent me a copy of the letter and I forwarded it to Ms. Kendrick per her request. Copiest of all emails will be provided to you for your review. Also attached is the applicant scoring quides on all applicants. As you will see, Ms. Johnson and Mr. Bowie both scored 87 and two other applicants scored higher than Ms. Walker, who scored a 77.*

In closing, the CP's claim that she was discriminated against because of her age or disability is unwarranted. The Respondent conducted a thorough hiring process in which all qualified applicants from the applicant pool were referred for an interview. All the intereviwees submitted to the same interview process and the position of Program Specialist II was given to the individual who scored the highest in that process. The CP was not selected for the Program Specialist II position because she did not score the highest during the interview process. The CP's age or disability was not a factor in that decision.

MDOC neither condones not participates in acts of discrimination against its employees, but rather supports the rights of all employees. The Respondent refutes any claim made by the Charging Party that she had been discriminated against in violation of the Age Discrimination in

3 of 4

Employment Act of 1967, as amended, and the Age Discrimination Act, as amendend. The Respondent respectfully requests that the Commission dismiss this charge and issue a No Cause Determination. Thank you for your consideration.

Sincerely,

Bryan P. Roberts
MDOC Attorney

4 of 4

Attachment: G

**Ms. Joann Walker**
503 E. Jefferson St. Yazoo City, MS 39194
(662) 571-9124
JoWalker@mdoc.state.ms.us (work)
delenewashington@gmail.com (personal)

October 21, 2023

Bryan P. Roberts, Attorney
MS Department of Corrections
301 North Lamar Street
Jackson, MS 39201

RE:    **Charging Party Joann Walker**
       **Charge No.: 423-2023-01219**

Dear Mr. Roberts:

I, Joann Walker am submitting this correspondence as my official response to the position statement concerning the issues related to charge number: 423-2023-01219. Additionally, I have attached documentation that is relevant to this charge for your consideration as well.

Below is a chronological accounting of my career with the Department of Corrections (MDOC).

Initially, I began my career with MDOC in September 1995 when I was hired by MDOC to work at the Madison County Community Work Center (CWC) as a Correctional Service Aide I. In 2006, I was promoted to the position of Correctional Case Manager. I resigned from my employment with MDOC in 2007 and was rehired back with MDOC in November 2009 as a Correctional Service Aide II at the Hinds County Restitution Center in Jackson, Mississippi. Later was I was promoted to the position of Correctional Case Manager at the Yazoo County Community Work Center (CWC), and I worked this position until this CWC location was closed in 2016. After the closure of the Yazoo CWC, I was transferred to the Leflore County Restitution Center in Greenwood, Mississippi and in November 2016 I was transferred to Hinds County Probation and Parole Office as a Special Projects Officer II. In 2020, my position title was changed from Special Projects Officer II to Parole Specialist II.

On January 10, 2023, I applied for the Position of Program Specialist II that was listed through the State Personnel Board for the Hinds and Madison Counties locations at the Probation and Parole Offices. On January 23, 2023, I received an email from Mrs. Shelby McTeer stating that my name was on the list of eligible for the position and if I was interested in interviewing to respond to the email no later than January 25, 2023. I replied and made the contact and scheduled my interview for January 26, 2023, at 10:00 a.m. At the conclusion of the

1 of 5

Page -2-
Response to Charging Party: Joann Walker
Charge No.: 423-2023-01219

interview, I asked the question, when will the position(s) be filled; Ms. McTeer responded that we (she, PPAS Gibbons and LEO II Mr. Holman) will make a decision today or within the next week.

On October 3, 2023, I received the Position Statement from MDOC Attorney and other paperwork which stated that Priscilla Johnson signed the MDOC applicant Date Form and Section 47-5-47 Mississippi Code of 1972 on January 27, 2023, one day after the interview. Also, on February 1, 2023, PTR for Priscilla Johnson was submitted for signature by CCD Hairston and forwarded to Human Resources.  On February 28, 2023, I emailed Mrs. McTeer inquiring about the status of the positions and she replied to me (via email) stating that all paperwork has been sent in and the Personnel Department would notify me when the position was filled (which at that time she already knew the position was filled); see attachment A.

On March 3, 2023, Mrs. McTeer was notified by Rotanya Kendrick via mail that per the State Personnel Board (SPB), Priscilla Johnson lack the required Bachelor's Degree and that she may request a substitution of 2 Associate Degrees as a substitution for the Bachelor's Degree. Mrs. McTeer stated that she would have to select the next highest scoring candidate or ask Ms. Johnson to send a substitution letter to SPB. Per documentation, it states in the Position Statement that Mrs. Johnson stated she had already submitted a substitution letter.  I, Mrs. Walker, did not receive a copy of the substitution letter nor verification of the date in which the Substitution letter was submitted to the SPB, indicating whether it was before or after Mrs. Johnson interviewed for the position.  Furthermore, it was stated that copies of all emails would be provided for review; to date Mrs. Walker has not received copies of the emails.

On June 8, 2023, I emailed Ms. McTeer again in reference to the status of the Program Specialist II position (although Ms. Johnson was already hired and working in the position, even though Ms. Johnson did not state what her position title was). The next evening (June 9, 2023) around 5:35 p.m., Ms. McTeer responded with a letter stating that she apologizes for the late notification, but the position was filled (see attachment C).

After reviewing the applicant's application, (see attachment C) interview questions and answers (see attachment D), and Score Sheet (see Attachment E) in particular points for experience, Priscilla Johnson stated on her application that she only has two (2) years of experience (which rates 6 points), but on her applicant scoring sheet it is shown that she has minimum and more than 5 years of experience (which rated her at 10 points). Also, in the written exercise, the potential points – 15 points for content, Ms. Johnson was given 14 points; and for spelling and grammar with a potential points of 15, Ms. Johnson was given 14 points, even after having at least six (6) or more misspelled words and several noted grammar errors (see attachment D).

2 of 15

Page -3-
Response to Charging Party: Joann Walker
Charge No.: 423-2023-01219

Additionally, there were discrepancies in other interview questions. Please see attachment D: Interview Questions for Region II Position of Program Specialist II. Noted below are questions and answers as given by Ms. Johnson that were inadequate in response and points awarded.

> **Question #4:**   If you are working alone . . . (Partial restatement of question, with only key phrase being stated)
> Ms. Johnson's answer: Ms. Johnson responded that she would "ask another agent to assist".
> My answer:   See them (the visitor) up front and not let them come to the back (to my office). Mr. Bowie's answer: He stated that he comes to work to work and he doesn't mine working alone or with sex offenders.
> My Comment: How would or could you ask another agent to assist, if as the question asked, "you are working alone"? The points awarded to both of us (me and Ms. Johnson) was 4 points.  Ms. Bowie was awarded 5 points.

> **Question #6:**  My concern is that points were awarded unfairly and incorrectly.
> Ms. Johnson and I responded to the question with the same answer, however, Ms. Johnson was awarded 5 points, and I (Mrs. Walker) was awarded 4 points. Mr. Bowie's answer was also the same as mine and he was awarded 5 points.
> My Comment:   Why were not points awarded correctly for the answers given based on the questions asked?

> **Question #7:** My concern is that points were awarded unfairly and incorrectly.
> Ms. Johnson was awarded 5 points, when in fact she did not answer the question correctly. Mr. Bowie's answer and mine were the same, he was awarded 5 points and I was awarded 4 points.
> My Comment: Why were not points awarded correctly for the answers given based on the questions asked?

> **Question #8:** My concern is that points were awarded unfairly and incorrectly.
> Ms. Johnson and I (Mrs. Walker) both answered the question the same way; Ms. Johnson was awarded 5 points, and I (Mrs. Walker) was awarded 4 points.
> My Comment:   Why were not points awarded correctly for the answers given based on the questions asked?

> **Question #9:** My concern is that points were awarded unfairly and incorrectly.
> Ms. Johnson responded but her response was not an answer to the question asked and yet she was awarded 4 points; I (Mrs. Walker) answered the question and was awarded 3 points. Additionally, to this same question, Mr. Bowie did not answer the question correctly and he was awarded 4 points.
> My Comment: Why were not points awarded correctly for the answers given based on the questions asked?

3 of 5

Page -4-
Response to Charging Party: Joann Walker
Charge No.: 423-2023-01219

> **Question #10:** My concern is the points were awarded unfairly and incorrectly.
> Ms. Johnson and Mr. Bowie were both awarded 4 points each, when in fact they did
> not answer the question in order. I (Mrs. Walker) answered the question and was
> awarded 3 points.
> My Comment: Why were not points awarded correctly for the answers given based on the
> questions asked?

## ADDITIONAL COMMENTS

Per conversation from with other employees at Hinds Probation and Parole Office, Ms. Johnson told them that she was home lying across her bed, when she received a phone call from Ms. McTeer, in which she was asked if she wanted the position of Program Specialist II, since the pay was higher than the previous position she had. And to this question from Ms. McTeer, Ms. Johnson stated she answered "yes" she wanted the job. Thus, it is my thinking that this is why Ms. Johnson's points were awarded in a manner that totaled higher than mine and all the other candidates except Mr. Bowie who was the same.

Moreover, even though Ms. Johnson's answers did not match the questions asked and her experience was not more than my experience, Ms. McTeer found it necessary to award her more points in order to show on paper that she ranked the highest of all candidates which would justify why she (Ms. Johnson) was given the position. It appears that Ms. McTeer had predetermined that Ms. Johnson would be the selected candidate regardless of the true scoring (her answers matching the questions with the correct awarded points). I (Mrs. Walker) also believe that there was no thought that anyone would question (file suit or a claim of unfairness) about the position being given to a less qualified candidate.

Although, I do not have an associate or bachelor's degree, my work experience of 20 years working with the Mississippi Department of Corrections in various correctional facilities more than qualifies me for the position of Program Specialist II. I have experience in supervising up to 180 offenders and residents, going to court, assisting with and completing Correctional Service Aide I duties, inclusive of answering the phone and answering inquirers questions on the procedure and protocols that must be followed by the offenders, setting up offender files (initial intake, risk assessment, post sentence investigation, and taking offenders pictures for loading them in the Caseload Explorer system and other related duties as assigned). In comparison, Ms. Johnson has only one (1) year and seven (7) months of work experience as a Correctional Service Aide II with Mississippi Department of Corrections, which include duties of answering the phone sometimes (turned the ringer off during work hours), partially set-up offenders files (Initial intake, risk assessment, post sentence investigation and taking pictures).

5 of 6

Page -5-
Response to Charging Party: Joann Walker
Charge No.: 423-2023-01219

And lastly, in comparison of resumes (see attachment F), Ms. Johnson versus my (Mrs. Walker) resume for positions held working with MDOC, Ms. Johnson's resume is not explicit in the description of her job duties for the position she held.   My resume is inclusive of the description of job duties and tasks performed for each position held.

In summary, it is my conclusive opinion and belief that the awarding of the position of Program Specialist II with MDOC was predetermined prior to the interview process and thus points were awarded during the interview to insure that the preselected candidate would be appear to be the best qualified candidate, when in fact she (Ms. Johnson) and he (Mr. Bowie) were not the best candidate for the position.

I am requesting that a thorough review of this application and candidate selection process be reviewed in in accordance with the hiring policies of the State Personnel Board and those of MDOC, to rectify the wrong that has transpired in hiring the less qualified candidate for the position of Program Specialist II.

Also, at the time Ms. Johnson was hired I was a 55 year old employee of this company and have been working as an employee of MDOC for over 13 years now.  I feel I have been an excellent employee during the entire period I have been working for MDOC.  I have always achieved the goals that have been set before me.  I have been punctual, reliable and efficient. Despite all this, you hired an employee that's only 28 years old, also half my age who had left the company only after working 1 years & 7 months as a Correctional Service I.

If additional information is required from me, do not hesitate to contact me immediately in writing.

Sincerely,

Mrs. Joann Walker